# APPENDIX OF EXHIBITS

# Table of Exhibits to Memorandum

| Number | Description |
|---|---|
| Exhibit A | Affidavit of Deidre Brown |
| Exhibit B | Performance audit from Georgia Department of Audits and Accounts regarding Subcontracts For Food Service Operations by the Business Enterprise Program Department of Labor dated December 2005 located at http://www.audits.state.ga.us/internet/pao/rpt_main.html |
| Exhibit C | DoD Directive 1125.3 |
| Exhibit D | Federal Register, vol. 62, . No. 145, Pages 40509-40510 |

# Exhibit A

BLACKSTONE
CONSULTING, INC.

Committed to Excellence

HOME
ABOUT BCI
MISSION/CORE VALUES
SERVICES
CUSTOMERS
OUR PARTNERS
SUPPLIERS/VENDORS
BCI CAREERS
CONTACT US

## Suppliers/Vendors

### Randolph Sheppard Division

In 1999, Blackstone Consulting, Inc. (BCI) expanded its operations and created a new division to identify and work with the blind and visually impaired vendors in the Randolph Sheppard Program in the delivery of food services. Currently, we enjoy excellent teaming relationships with Randolph Sheppard vendors at seven major sites.

BCI and each of our Randolph Sheppard teaming partners benefit greatly from our association. For this reason, we are actively seeking new opportunities to further increase our growing activity in the area. If you are a Randolph Sheppard vendor, or if you know a vendor, who shares our commitment to excellence in the service we provide our customers, and would like to explore an association with BCI, please contact us at:

MAILING ADDRESS
Blackstone Consulting, Inc.
11726 San Vicente Blvd.
Suite 550
Los Angeles, CA 90049

TELEPHONE
310.826.4389

FACSIMILE
310.826.7269

EMAIL
info@blackstone-consulting.com

Blackstone Consulting, Inc.
11726 San Vicente Blvd.
Suite 550
Los Angeles, CA 90049
310.826.4389

EXHIBIT A

site design by altus studios

© 2005 Blackstone Consulting, Inc. All rights reserved

# Exhibit B

# Performance Audit

## Subcontracts For Food Service Operations By The Business Enterprise Program

Department of Labor

*Russell W. Hinton*
*State Auditor*

Performance Audit Operations Division
Georgia Department of Audits and Accounts

December 2005
Report 05-09

## *Executive Summary:*

**The Program's subcontracts for food service operations primarily serve to enable a handful of blind contract managers to earn substantial incomes by "teaming" with private firms that actually run the large food service operations.**

In recent years the Business Enterprise Program has started subcontracting with commercial food service operations to provide services at large federal facilities. As a result of our review, we reached the following conclusions regarding the Program's use of these subcontracts:

- As currently administered, the Program's food service contracts may not be in keeping with the purpose and "spirit" of the federal Randolph-Sheppard Act. The Program has not defined the duties of its contract managers, which has resulted in the contract managers having little, if any, responsibility related to the overall operation and success of subcontracted food service operations.
- The Program is not using its food service subcontracts to benefit the maximum number of blind vendors (as specified in federal regulations). The subcontracts provide employment for only five blind contract managers (whose 2004 income ranged from $58,675 to $946,936). In addition, the Program has not taken action to increase the number of blind and disabled individuals employed under the subcontracts.
- The contract managers are not making progress towards eventually taking over control of the subcontracted operations.
- The Program has not developed procedures to ensure that the contract manager positions are filled by the most qualified persons. In addition, the Program's current process for selecting contract managers has resulted in some applicants receiving an unfair advantage over other applicants.
- The Program's Fort Benning subcontract with a limited liability company (LLC) leaves the state potentially liable for costs associated with food-borne illnesses.
- The four subcontracts contributed $135,584 less than the standard set-aside rate that is typically contributed by blind vendors for Program operations.

## Audit Purpose

The purpose of this audit was to review the Business Enterprise Program's use of subcontracts with commercial food service operations for providing food services at large federal facilities. The audit specifically reviewed how the Program managed and monitored these subcontracts and also examined how the subcontracts were used to help the Program achieve its overall goals and objectives related to helping blind people in Georgia.

## Purpose of the Business Enterprise Program

The federal Randolph-Sheppard Act of 1936 was enacted to provide blind persons with remunerative employment, increase economic opportunities for the blind, and to help make the blind self-supporting. This act specifically gives ***priority*** for the operation of vending facilities on federal property to blind vendors licensed by a State Licensing Agency (SLA).



EXHIBIT "B"

The priority granted by the Randolph-Sheppard Act essentially provides that most federal facilities must utilize licensed blind vendors for their food service operations if these vendors can offer competitive services. Georgia's Business Enterprise Program (BEP) was created in 1944 to operate as the SLA for Georgia. The Program seeks to help blind Georgians become independent operators of snack bars, cafeterias, and vending machines (referred to as vending facilities) in government and commercial buildings throughout the state. The Program is part of the Department of Labor's (DOL) Division of Rehabilitation Services.

## History of Subcontracting Under the Business Enterprise Program

The Program was originally intended to help blind vendors set up and operate snack bars and vending operations; in recent years, however, the Program has started expanding into larger and more complex food service operations at federal facilities. As Georgia's SLA, the Business Enterprise Program can obtain contracts to provide food services at federal facilities in the state utilizing the priority provisions of the Randolph-Sheppard Act. Because the Program's vendors do not have the capacity or experience needed to provide such large food service operations, the Program subcontracts with commercial food service companies (referred to as "teaming partners") for these large operations. While a blind vendor is not actually operating the food service facilities, a licensed blind vendor is appointed to act as a "contract manager" to administer the contract.

The relationship between the contracts and subcontracts for these large food service operations is shown in **Exhibit 1**. The subcontract between the BEP, the teaming partner, and the contract manager(s) is typically called an "operational support agreement". It should be noted that the teaming partner and contract managers providing food services for Fort Benning formed a limited liability company (LLC) and the subcontract for this location is essentially between the BEP and this LLC.

The contract managers for the subcontracts are selected primarily through an interview process. The Program's licensed vendors and licensee candidates are informed of the availability of the position; applicants that meet basic eligibility requirements are then interviewed by a three-person panel consisting of one BEP employee and two licensed blind vendors. Each person on the panel scores the applicant's answers to a set of questions and the applicant(s) with the highest score(s) are awarded the position(s); an additional BEP employee acts as a moderator and does not score the applicant's answers.

**Exhibit 1**

**Parties Involved in Food Service Contracts and Subcontracts**




Source: Program Records

Program personnel have indicated that it was hoped that eventually the blind vendors operating as contract managers would be able take over operations and phase-out the teaming partner. While the timeframe for this transition was not identified in any operational support agreements, Program personnel indicated that they expected the contract managers would be able to take over the operation within five years. In addition, most of the operational support agreements provide that the contract managers should take steps to increase the proportion of disabled persons employed under the subcontracts to 20% over five years.

The Program's use of contract managers and food teaming partners started in 1997 when the Program was approached to operate a food court at the Atlanta Federal Center. Since that time, three more subcontracted operations were added, with the most recent subcontracted operation (Fort Benning) being the largest and most complex. **Exhibit 2** on the next page lists the current subcontracted operations as well as the one planned subcontract. The four current contracts have a total estimated value of approximately $34.6 million annually.

**Exhibit 2**
**Subcontracted Food Service Operations**
**(As of September 2005)**

| Year | Facility | Description | Estimated Annual Contract Value |
|---|---|---|---|
| 1997 | Atlanta Federal Center (Atlanta) | The federal General Services Administration (GSA) asked the Program to put a food court in the Atlanta Federal Center as a trial project. The Program selected a food teaming partner who specialized in operating food courts in shopping malls to work with a licensed blind vendor that functioned as a contract manager. | $1 million |
| 1999 | Federal Law Enforcement Training Center (FLETC) (Glynn County) | The food service provider for FLETC asked the Program to partner with them to obtain a new contract under Randolph-Sheppard priority provisions. | $6.3 million |
| 2001 | Robins Air Force Base (Warner Robins area) | The dining facility contractor for Robins asked the Program to partner with them to obtain a new contract under Randolph-Sheppard priority provisions. | $2.2 million |
| 2003 | Fort Benning Army Post (Columbus area) | The Program sought the contract for Ft. Benning. The current teaming partner was selected by the Program after evaluating proposals from several food service companies. Two licensed blind vendors were selected to operate as contract managers. | $25.1 million |
| 2006 (projected) | Fort Gordon Army Post (Augusta area) | The Program is in the process of obtaining the military dining contract for Fort Gordon. It has selected a teaming partner and a licensed blind vendor to operate as the contract manager. The contract is expected to be awarded in 2006. | Not yet Available |
| **TOTAL** | | | **$34.6 million** |

Source: Program Records and Interviews

Like all blind vendors the subcontracted operations are required to remit a portion of their net proceeds called "set-aside" to cover costs involved with operating the Program. The set-aside funds can only be used for the purchase and maintenance of equipment, management services, retirement or health benefits for blind vendors, sick pay and vacation pay for blind vendors, and payments to vendors to equalize their incomes (called fair minimum return). The set-aside amount is typically 12% of net proceeds. In fiscal year 2004, the Program received $561,628 in set-aside funds from the subcontracted operations. The contract managers' income is based on a share of the operation's profits or a guaranteed amount.

## Methodology

This audit was conducted in accordance with generally accepted government auditing standards for performance audits. In conducting this project, the audit team researched applicable laws and regulations and interviewed key personnel with the Business Enterprise Program and with other units within the Department of Labor. The evaluation methodology included reviews of Program files and records and a detailed review of the Program's most recent subcontract for services provided at Fort Benning. The team also requested input from the Office of the Attorney General of Georgia regarding concerns about possible liability issues, and the confidentiality of Program information. It should be noted that we did not review the Program's process for selecting food teaming partners.

This report has been discussed with appropriate personnel representing the Department of Labor. A draft copy was provided for their review and they were invited to provide a written response, including any areas in which they plan to take corrective action. The Department's response is included as **Appendix E.** It should be noted that information indicating that one of the Program's contract managers may have been improperly collecting disability retirement was referred to the Employees' Retirement System for further investigation.

It should also be noted that a separate report on the overall operation of the Business Enterprise Program entitled ***Business Enterprise Program - Operations and Management Controls*** is scheduled for release in January 2006.

## Findings

**Summary Finding**

**Although the Program has assumed responsibility for overseeing complex food service contracts with annual revenues of about $35 million, it continues to operate as if it were only responsible for administering the operation of snack bars and vending machines.**

Our review found that the Program has not established adequate goals and objectives, policies and procedures, or internal controls related to its multi-million-dollar food service contracts. This situation has resulted, in part, from the Program allowing a few blind vendors, who stood to personally benefit from the contracts, to basically determine how the subcontracts were structured and administered.

The Program's lack of oversight and management controls has resulted in a number of questionable issues regarding the Program's subcontracts for the food service operations. Specifically, the subcontracts do not appear to be in keeping with the purpose of the Randolph-Sheppard Act; the subcontracts provide direct employment for only five blind contract managers (whose 2004 income ranged from $58,675 to $946,936); the process for selecting the contract managers is questionable; and the Program has no procedures for ensuring that the amount of set-aside funds collected through the subcontracts is accurate or in keeping with the percentage typically collected from its snack bar vendors. These issues are discussed in more detail in the remainder of the report.

**Finding No. 1**

**As currently administered, the Program's food service contracts may not be in keeping with the purpose and "spirit" of the Randolph-Sheppard Act.**

The Randolph-Sheppard Act requires that federal agencies give preference to blind vendors in ***operating*** cafeterias on federal property ***if they can provide services comparable to those provided by other vendors***. Under the Program's current subcontracts, however, the blind vendors only serve as contract managers; they do not actually operate facilities or provide any of the food services. Our review also found that the Program has not defined the duties of the contract managers, which has resulted in the contract managers having little, if any, responsibility related to the overall success of the subcontracted food service operations. For example:

- In response to a performance evaluation prepared by the Program, one of the contract managers wrote that - ***"I in fact have no meaningful***

***function in the management of this contract. I am only expected by [the food service provider] and Georgia BEP to show up, sit on my ass, draw a salary and keep my mouth shut."***

- Another of the contract managers lives 97 miles (approximately a four-hour round-trip commute) from the location of the food service operation. Reportedly, this manager commutes to the facility using a company-paid driver and vehicle.

It should be noted that a U.S. Senate Committee Report on the Randolph-Sheppard Act published in October 2005 took exception to the use of contracts that gave *"huge financial windfalls to a few licensed blind vendors."* The report noted that *"Although the original purpose of the law* [the Randolph-Sheppard Act] *was to help blind persons obtain competitive employment, it has made a select few of them wealthy and done little if anything for the vast majority."* The report also indicated that the Committee could begin considering legislative and other alternatives to improve the program and increase the number of employment opportunities available to persons with disabilities to help fulfill the original intent of Congress.

Program personnel have indicated that the current "teaming" arrangement utilizing contract managers was necessary due to the blind vendors' lack of expertise in running large food service operations. They also indicated that they expected the contract managers to eventually assume responsibility for operating the facilities (after receiving hands-on training). As discussed in Finding No. 3 on page 9, however, there is no indication that any of the contract managers will ever assume responsibility for actually operating the subcontracted food service facilities.

**Finding No. 2**
**The Program is not using its food service subcontracts to benefit the maximum number of blind vendors. In addition, the Program has not taken action to increase the number of blind and disabled individuals employed under the subcontracts.**

Federal regulations provide that when a state Program is granted priority for the operation of cafeterias on federal property, the operations are ***"expected to provide maximum employment opportunities to blind vendors to the greatest extent possible"*** (emphasis added). In addition, three of the Program's current subcontracts with teaming partners require that contract managers make good faith efforts to increase the proportion of disabled individuals employed under the subcontracts to 20% of the total workforce over five years. (A renewal of the remaining subcontract that is in the process of being approved also includes this

provision.) The subcontracts also require submission of an annual report to the BEP on the number of disabled individuals that are employed under their subcontracts. As discussed in the following paragraphs, our review found that the Program's subcontracts are not being effectively used to benefit blind and disabled individuals in the state.

- As previously noted, the Program's four food service contracts generate an estimated $35 million in annual revenues but provide employment for only five blind vendors operating as contract managers. The annual income of these contract managers in 2004 averaged $451,621 (ranging from $58,675 to $946,936). In comparison, the total revenue of all the Program's snack bars and other vending operations had total annual revenues of about $12 million, but employed 84 blind vendors operating the facilities. The average income of these 84 persons in 2004 was $39,015.

- The audit team found that the required reports on employment of disabled individuals were not being submitted. At the request of the audit team, the Program obtained some information regarding the number of disabled employees from the four subcontractors. It should be noted, however, that the information was not verified and information was not available regarding the nature or scope of the employees' disabilities. Based on the information provided (see **Exhibit 3**), it appears that the contract managers are making little effort to use the subcontracts to help other blind and disabled individuals. The reported proportion of disabled persons employed under the subcontracts ranged from 0% to 11.5%.

**Exhibit 3**

**Reported Disabled Employees at Subcontracted Operations**

**(As of Different Periods in 2005)**

| Subcontracted Operations | Number of Years Subcontracted | Total Number of Employees | Disabled Employees[1] | |
|---|---|---|---|---|
| | | | Number | Percent |
| Atlanta Federal Center | 8 | 13 | 0 | 0.0% |
| Federal Law Enforcement Training Center[2] | 5 | 140 | 1 | .7% |
| Robins Air Force Base | 4 | 96 | 11 | 11.5% |
| Fort Benning[3] | 1 | 1,002 | 42 | 4.2% |

[1] Not including contract managers
[2] Current subcontract has no disabled employee requirements; new contract has disabled employee requirements.
[3] As of August 2004
Source: Reports provided by Contract Managers

The Program's subcontracts should be redesigned to provide for participation by a larger number of blind vendors instead of limiting participation to one or two blind contract managers. It should be noted that federal law does not specifically define how these subcontracts should be structured and provides sufficient latitude for different operating designs that could result in more blind and disabled persons benefiting from the subcontracts. While there are numerous contract designs that would benefit more blind vendors, possible redesigns of current subcontracts might include:

- The Fort Benning subcontract could be designed with the facility's 21 cafeterias established as "cost centers," with blind vendors operating as cafeteria managers and having operational responsibility over the individual cafeterias. If additional training is needed to enable the blind vendors to manage the cafeterias, the vendors could be initially hired as assistant managers to obtain the needed training. Contract managers might be utilized for administrative duties; however, the almost $2 million of profits that currently goes to two contract managers might be used to pay the contract managers and the cafeteria managers.
- The Robins Air Force Base subcontract could also be designed with the facility's three cafeterias established as "cost centers" with blind vendors serving as cafeteria managers and having operational responsibility over the individual cafeterias.
- While the Federal Law Enforcement Training Center contract only has one cafeteria, its relative size ($6.3 million in annual revenue and 140 employees) would probably justify two or more blind vendors operating as cafeteria managers with some division of duties and responsibilities between the vendors.

In addition, to utilizing the subcontracts to employ more blind vendors, the Program should also take steps to ensure that contract managers demonstrate progress towards meeting the Program's objective of having blind and other disabled persons comprise 20% of the contracted workforce. Finally, the Program should require the contract managers to submit the required reports documenting the number of disabled persons employed under the subcontracts.

**Finding No. 3**

**The Program is not ensuring that contract managers are making progress towards the Program's goal that the subcontracted facilities eventually be taken over and operated by blind vendors.**

While the Program has indicated that its goal is that all the subcontracted operations should eventually be operated by blind vendors without the need for

teaming partners, the Program has no plans for how this goal will be accomplished and cannot show any significant progress towards this goal for any of its current subcontracts. It appears that the subcontracts are destined to always use commercial teaming partners, with a few blind contract managers essentially being paid to enable the teaming partner to have priority in obtaining a federal contract. Specific problems with progress towards the Program's goal of eventually phasing out the use of teaming partners are discussed below.

- The Program has not developed any plans for developing the skills and abilities of the contract managers to enable them to eventually take over operations that are currently subcontracted. Although training plans for contract managers are specifically required by the operational support agreements, such plans have not been prepared for any of the current subcontracts.
- The Program is not monitoring the progress of its contract managers towards the Program's goal of phasing out the use of teaming partners. While the operational support agreements also require quarterly training reports on the progress of contract managers, none of the current subcontractors is providing these reports to Program management.
- Contract managers have also been allowed to "job hop" from one contract to another and, as a result, have not stayed at any one location long enough to take over an operation. For example, over the last eight years, one individual has been a contract manager at three different facilities. In spite of having eight years of contract management experience, the individual is only in the third year of his current subcontract. The one contract manager that has remained at a location longer than the Program's five-year objective for phasing out teaming partners still has not taken over the subcontracted operation.
- While two of the five current contract managers are over 60 years of age (and one is in his late 50's), the Program does not have any succession plans for developing the next generation of blind vendors capable of operating large food service operations without the assistance of teaming partners.
- None of the profits resulting from the subcontracts are being reinvested into the operations to enable the contract managers to eventually take over. For example, the two contract managers for the Fort Benning contract take in annual profits of nearly $1 million each; however none of this profit is being used to retire a capital advance of approximately $3.1 million that was provided by the teaming partner or to accumulate funds to buy out the teaming partner's 49% interest in the limited liability company.

If the Program continues to use subcontracts with teaming partners, it needs to develop specific plans for helping contract managers develop the skills, abilities,

and resources needed to take over the operation of the subcontracted facilities. The progress of contract managers towards development goals should be monitored so changes can be made as necessary to keep the contract managers' development on track. Subcontracts with teaming partners should not be allowed to continue indefinitely.

**Finding No. 4**

**The Program has not developed procedures to ensure that the contract manager positions are filled by the most qualified persons.**

The Program's current selection process for filling contract manager positions is virtually identical to the process used to select blind vendors to operate snack bars. As discussed below, the Program has restricted the "pool" of potential applicants, has not established objective criteria for evaluating applicants, and does not offer any training related to the contract manager positions.

- The Program has not taken steps to identify blind individuals in the state with skills, abilities and desire to work as contract managers. The Program has effectively limited its "pool" of possible applicants to the 116 licensed blind vendors/licensee candidates in the state that have been trained to operate snack bar type operations. It should be noted that the Program's contract managers have also predominately been members of the Program's Committee of Blind Vendors (a 12-member advisory council composed blind vendors). Of the Program's five current contract managers, four are current or former Committee members and the fifth is a former alternate member of the Committee.
- Aside from basic Program eligibility requirements, the contract manager positions are filled based on a subjective interview consisting of 10 or 12 questions. The applicant's answers to the questions are evaluated by interviewers with no real knowledge about the duties and responsibilities of contract managers. Objective criteria such as education and prior work experience are not considered in the selection process.
- The Program has not documented the specific duties and responsibilities of contract managers and does not offer any training related to the contract manager positions other than 5-to-10 days of job shadowing prior to becoming licensed. Such training could be used to prepare blind vendors for assuming contract manager positions and would also help the Program to evaluate the skills and abilities of applicants based on their performance during training.

The Program should develop a recruiting plan to identify and train blind individuals who have the potential to perform as contract managers. The Program should also develop a more objective selection process for filling the

contract manager positions and should establish training programs for contract managers.

**Finding No. 5**

**The Program's current process for selecting contract managers has resulted in some applicants receiving an unfair advantage over other applicants.**

The Program's interview process used to select contract managers is flawed. A detailed review of the interview process used to select the contract managers for the Fort Benning subcontract identified the following problems.

- Misleading information in the position announcement for the Fort Benning subcontract may have discouraged applicants from applying. As shown in **Exhibit 4**, the position announcement did not fairly present the almost $1 million income potential and limited day-to-day operational responsibilities actually involved with the positions. For example, while the position announcement seemed to indicate that contract managers might be expected to be on-site constantly, that did not turn out to be the case. In fact, as previously discussed, one of the contract managers did not even relocate his residence from south Atlanta to the Fort Benning/Columbus area.

**Exhibit 4**
**Comparison of Position Announcement to Actual Job Attributes for the Fort Benning Contract Manager Positions**

| Position Announcement | Actual Job Attributes |
|---|---|
| Income in six-figure range | Actual income in 2004: more than $946,000 each for two contract managers |
| Cafeterias operate 24 hours per day, seven days a week, with no holidays | One contract manager reported that they (the two contract managers) try to ensure that *one* of them is at work every day (Monday-Friday). The manager also said that they made a commitment to "come to work and not wait at home." |
| Contract Managers are expected to work 8 hours per day during the 9 hours from 6:30 a.m. to 3:30 p.m. | Contract managers reported that they work from 9 a.m. to 4 p.m. (7 total hours) |
| Announcement noted that the job would be physically demanding, including heavy lifting, the ability to stand for long periods of time, and the ability to work for longer than eight hours at a time. | The positions are office jobs with very limited physical demands. |

Source: Program Records and Interviews With Contract Managers

- Only six licensed vendors applied for the two Fort Benning contract manager positions. One of the applicants was declared ineligible;

however, the Program had no information on why this applicant (reportedly with over 19 years of high volume restaurant experience) was declared ineligible. When interviewed by the audit team, the person who was cited in a memo as ruling the vendor ineligible was not aware of any reason why this vendor might have been ineligible. One applicant withdrew from consideration.

- Several of the interview questions used to select the contract managers were developed by an applicant who was eventually awarded one of the positions. As shown in **Appendix A** (copy of e-mail) and **Appendix B** (copy of interview questions), four of the 12 questions asked during the interview were suggested by this applicant (who received a score of 194 out of a possible 195 points).
- Scores were changed on the individual interviewer's score sheets and on the total tally sheet with no explanation. Given the closeness of the scores for two applicants, these changes may have impacted the results of the selection process. A copy of the tally sheet and individual score sheets showing the changes made to the scores for these two applicants is included as **Appendix C** and **Appendix D**.
- The interview panel did not have standardized criteria for scoring the answers given by the applicants; therefore, it could not be determined why one applicant's answer was worth more points than another applicant's answer. When asked to explain the scoring criteria, the Program Director reported that there was not sufficient information in the files to explain why some answers were scored higher than other answers.

The Program should take steps to establish procedures and controls to ensure the fairness of the process used to fill contract manager positions. Position announcements should provide an accurate picture of the anticipated duties, responsibilities, and compensation. Decisions declaring any applicants ineligible should be fully documented. Certain applicants should not be given the advantage of assisting in the development of interview questions. Any changes to interview scores should be fully explained and approval of any changes should be documented. Finally, the criteria for scoring applicant interviews should be clearly defined to ensure that it is consistently applied by the interview panel and to support selection decisions.

**Finding No. 6**

**The Program has not ensured that the subcontracts with limited liability companies (LLCs) adequately protect the state's interests. The Fort Benning subcontract with an LLC leaves the state potentially liable for costs associated with food-borne illnesses.**

As it is currently structured, the contract and subcontract for Fort Benning leaves the state liable for any costs associated with food-borne illness, including hospitalization costs and the cost to recycle troops through training. The contract for Fort Benning food services which is between the SLA (the Business Enterprise Program) and the Department of the Army assigns liability for any costs associated with any food-borne illness to the contractor (BEP). BEP subsequently subcontracted with a limited liability company (composed of the teaming partner and two contract managers) for these services. The subcontract does not transfer liability to the LLC; therefore, the state remains liable for any costs associated with food-borne illness.

When this potential liability issue was called to the attention of Program management, the LLC added the state to its liability insurance policy, which provides $12 million in coverage; however no provisions have been added to the subcontract provisions transferring liability to the LLC. It should be noted that the BEP has also required that a limited liability company be formed for the planned Fort Gordon subcontract.

The Program should revise the subcontract for food services at Fort Benning to transfer liability for any costs associated with food-borne illness from the state to the LLC that employs the personnel that actually handle food at that facility. Future subcontracts should clearly identify that LLCs employing personnel that handle food at subcontracted food service sites are liable for any costs associated with food-borne illnesses.

**Finding No. 7**

**The Program has not ensured that all the subcontracts are contributing the standard 12% of net proceeds "set-aside" that is typically contributed by blind vendors for Program operations.**

Currently, the subcontracts with teaming partners are not designed to obtain the standard 12% of net proceeds that is paid by the other blind vendors in the Program. In addition, the Program is not verifying that the set-aside payments remitted by the teaming partners are correct. As shown in **Exhibit 5**, the subcontracted operations have contributed $135,584 less than the $697,212 that should have been collected at the standard set-aside rate. These additional set-aside funds could have been used for acquiring equipment, paying for management services, or funding blind vendor retirement and health benefits. Specific problems with the Program's collection of set-aside funds from the subcontracted operations are described in the following paragraphs.

- While blind vendors are not allowed to deduct management fees or a salary for themselves prior to calculation of their net proceeds, the subcontracted operations are allowing the teaming partners to deduct management fees which reduce the net proceeds for the subcontract and therefore reduce set-aside collections. As shown in **Exhibit 5**, information available for the four subcontracts indicated that the deduction of management fees reduced set-aside collections by approximately $157, 258.
- Two subcontracts were identified that provided for set-aside contributions that were about $18,358 less than the typical 12% of net proceeds set-aside rate in fiscal year 2004. One subcontract collected $40,032 more than the typical set-aside rate. The remaining subcontract collected the typical set-aside rate. The net impact was collections of $21,674 more than the typical set aside rate.
- In addition, the Program does not have procedures to verify that the amount of set-aside remitted by teaming partners is correct. The audit team identified that one subcontract contributed $2,374 less than the amount contractually required. When this was called to the Program's attention, arrangements were made for collection of these funds.

Future subcontracts and any renewals of existing subcontracts should require collection of set-aside amounts that are equal to the standard set-aside rate paid by other blind vendors in the Program. The Program should also develop procedures to verify that the amount of set-aside remitted by the teaming partners is correct.

## Exhibit 5
## Actual and Potential Set-Aside Collections for Subcontracts
## Fiscal Year 2004

| Subcontract | Current Basis for Set-Aside | Actual Set-Aside Collections | Net Proceeds (including Contract Mgr. income) | | | Mgt. Fee | | Total Additional Potential Set-Aside | Total Potential Set-Aside |
|---|---|---|---|---|---|---|---|---|---|
| | | | Amount | Potential Set-Aside at 12% | Additional Potential Set-Aside | Amount | Additional Potential Set-Aside | | |
| Atlanta Federal Center | 12% of Contract Manager income and 12% of facility net proceeds | $10,037[1] | $83,717 | $10,046 | $9[2] | $60,041 | $7,205 | $7,214 | $17,251 |
| Federal Law Enforcement Training Center | ¾ of 1% of the billing for student meals, maintenance and project management. (No set-aside deducted from Contract Manager income.) | $52,270[3] | $101,982 | $12,238 | ($40,032) | $443,596 | $53,231 | $13,199 | $65,469 |
| Robins Air Force Base | 12% of Contract Manager income | $19,391 | $314,501[4] | $37,740 | $18,349 | $149,320[4] | $17,918 | $36,267 | $55,658 |
| Fort Benning | 12% of the net proceeds for the facility | $479,930[5] | $3,999,416 | $479,930 | $0 | $657,534[5] | $78,904 | $78,904 | $558,834 |
| TOTAL | | $561,628 | | | ($21,674) | | $157,258 | $135,584 | $697,212 |

[1] Program collected $7,663 during 2004 and is in the process of collecting an additional $2,374 identified by the audit team. (Unaudited based on Federal Fiscal year 2004)
[2] Contract Manager not required to pay set-aside on sales bonus payments he receives.
[3] Based on unaudited information provided by the teaming partner for October 2003 – September 2004
[4] Based on unaudited information provided by the teaming partner for April 2003 to March 2004
[5] Based on the Calendar Year 2004 audit for the LLC providing services at Fort Benning

Source: Program Records and Information Provided by Teaming Partners

# Appendix A
## E-mail Regarding Development of Interview Questions For the Fort Benning Contract Manager Positions

GroupWise WebAccess Message Item — Page 1 of 1

**Mail Message** — Novell

[redacted]

Previous Next Forward Reply to Sender Reply All Move Delete Properties

From: [redacted]
To:
Date: Tuesday - December 18, 2001 11:38 AM
Subject: Ft. Benning interview questions

The questions I have were generated after speaking with [redacted] and what he felt was important to that type of operation. I hope some of these will be of use

1) Explain the relationship between the Co-op, vendors and the SLA
2) Describe a situation that best reflects how you have taken "responsibility of ownership" in your present facility
3) What system do you have in place to ensure proper documentation of events?
4) How have you resolved a conflict with a grantor or building manager?
5 How have you resolved a conflict with a customer?
6 How have you handeled a problem employee?
7) What experience do you have with negotiating or understanding contracts?
8) What have you learned or encountered in the past that will most benefit you if chosen for this position?
9) Give an example of a problem area in your facility that you identified and how you resolved it
10 Serve safe....What is the four-hour rule?
11 Serve safe....How does food borne illness happen?

(A) Name of Counselor that suggested questions for interview

(B) Name of Blind Vendor that was ultimately selected for one of the Contract Manager positions.

Source: Copy of E-mail From Program Counselor Regarding Development of Questions Used By Interview Panel

(Note: The questions highlighted in yellow that were generated by one of the winning applicants for the positions were actually used for the interview – see Appendix B)

# Appendix B
## Interview Questions For the Fort Benning Contract Manager Positions

PROPOSED QUESTIONS
Fort Benning

6. How would you define the difference between the role of contract manager at a cafeteria or food court, and the role of contract manager at a military installation?

Describe a situation that best reflects how you have taken "responsibility of ownership" in your present facility.

The positions you are interviewing for are referenced as "Contract Manager." Give us your definition of this title.

This is a multiple-vendor location. What experience have you had in working in a multiple-vendor location, and what techniques did you or would you use to coordinate the responsibilities of each position.

5. What system do you have in place to ensure proper documentation of events?

There will be a partner selected to assist in the operation of this facility, tell us how you perceive this relationship?

The licensed blind vendors/contract managers selected for Fort Benning will be involved in the selection of a food service company to partner with the SLA in pursuing the military contract. What criteria would you use to select a food service partner? Which of these items do you consider the most important?

What experience do you have with negotiating or interpreting contracts?

9. This is a 365-day operation; tell us how you plan to manage this multiple-vendor location.

10. Employees in a military food service operation are not the direct employees of the licensed blind vendor/contract manager. What experience have you had working in a similar situation, and how did you ensure that you were involved in the hiring and termination process.

11. What have you learned or encountered in the past that will most benefit you if chosen for this position?

12. You have been made aware that there is a problem with a staff person that works on the line. Tell us what process or procedure you would use to handle this problem.

Give us an example of a problem area in your facility that you identified and how you resolved it.

The military contract manager has contacted you and advised that not all the specifications in the contract are being met, how would you respond to him and what would you do to rectify this problem?

This will be a high profile job, how do you see yourself interacting with the food service provider and the base executive staff and meeting their needs.

What is hazard analysis critical control point (HACCP)? Is there a food safety system.

Source: Copy of Actual Questions Used By Interview Panel (Provided By Program)

(Note: The questions highlighted in yellow were generated based on one of the winnining applicant's suggestions.)

## Appendix C
## Changes to Scores for Interview Questions For the Fort Benning Contract Manager Positions

| Applicant | Question | #1 | #2 | #3 | #4 | #5 | #6 | #7 | #8 | #9 | #10 | Total | #11 | #12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 1 | 5/5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 65 | 5 | 5 | |
| | 2 | 5/5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 65 | 5 | 5 | |
| | 3 | 5/5 | 5 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 65 | 5 | 5 | |
| | Total | 30 | 15 | 14 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 194 | /3 = [illegible] | 15 | 64.6 |
| B | 1 | 5/4 | 5 | 5 | 5 | 5 | 5 | 53 | 5 | 5 | 4 | 59 | 4 | 4 | |
| | 2 | 4/4 | 4 | 5 | 5 | 5 | 5 | 43 | 5 | 5 | 84 | 57 | 4 | 4 | |
| | 3 | 4/4 | 3 | 5 | 4 | 5 | 4 | 3 | 5 | 5 | 4 | 54 | 4 | 4 | |
| | Total | 35 | 12 | 15 | 14 | 15 | 14 | 9 | 15 | 15 | 12 | 170 | /3 = 56.6 | | |
| C | 1 | 5/5 | 4 | 4 | 4 | 4 | 5 | 4 | 5 | 4 | 5 | 57 | 4 | 4 | |
| | 2 | 5/4 | 4 | 5 | 5 | 4 | 4 | 4 | 5 | 5 | 5 | 59 | 4 | 5 | |
| | 3 | 5/5 | 4 | 4 | 5 | 5 | 5 | 4 | 5 | 4 | 4 | 60 | 5 | 5 | |
| | Total | 29 | 12 | 13 | 14 | 13 | 14 | 12 | 15 | 13 | 14 | 176 | /3 = 58.6 | 14 | |
| D | 1 | 4/4 | 4 | 4 | 4 | 3 | 3 | 4 | 4 | 4 | 3 | 49 | 4 | 4 | |
| | 2 | 4/5 | 5 | 4 | 4 | 4 | 2 | 4 | 4 | 4 | 43 | 52 | 5 | 54 | |
| | 3 | 3/3 | 4 | 2 | 3 | 4 | 2 | 3 | 2 | 3 | 3 | 41 | 5 | 4 | |
| | Total | 23 | 13 | 10 | 11 | 11 | 7 | 11 | 10 | 11 | 9 | 142 | 14 | 12 | |

Interviewer names removed – Interviewers identified as (1), (2), and (3).

Applicant Names removed – Applicants (A) and (C) were selected for the Contract Manager positions.

Source: Copy of Actual Summary Score Sheet Used By Interview Panel (Provided By Program)

(Note: The areas highlighted in yellow show changes to applicant scores)

## Appendix D
## Changes to Interviewer Scores

**Applicant B - Interviewer 1**

(6) 5
(7) 3
(8) 5
(10) 4 willing to pay for Grease Trap Cleanout
(11) 4
(12) Partnership with 4

**Applicant B - Interviewer 2**

7 4 3
8 5
9 5
10 5 4

**Applicant B - Interviewer 3**

5 11. immediately fix problem & send a letter to let him know it was fixed
4 12. partnership equally provide what they need no problems

**Applicant C - Interviewer 1**

(5) 4
(7) 4
(8) 5
(10) 5

Was recorded as 5/4 on talley sheet (see Appendix C)

**Applicant C - Interviewer 2**

1 very good answer 5 5
good 4

Applicant Names Not Shown – Applicant C was selected for one of the Contract Manager positions.
Source: Copies of actual interview score sheets used by interview panel members (Provided By Program)
(Note: The areas highlighted in yellow show changes to applicant scores)

# Appendix E
# Department of Labor's Response to Report Draft

GEORGIA DEPARTMENT OF LABOR

148 Andrew Young International Blvd. N.E. ◆ Atlanta, Georgia 30303-1751

Michael L. Thurmond
Commissioner

December 8, 2005

Mr. John S. Abbey
Director
Performance Audits Operations
270 Washington Street, S.W.
Room 1-156
Atlanta, Georgia 30334-8400

RE: Performance Audit Draft Report – Subcontracts for Food Service Operations

Dear Mr. Abbey:

Enclosed please find the Agency's responses to the draft report on Subcontracts for Food Service Operations by the Business Enterprise Program. We welcome the opportunity to discuss how our responses will be presented in the final published report.

Sincerely,

C. Ray Josey

C. Ray Josey
Acting Deputy Commissioner

Enclosure

cc: Michael L. Thurmond, Commissioner
Russell W. Hinton, State Auditor
Bobby Pack, Assistant Commissioner, Rehabilitation Services
Rajaunnda D. Gandy, Director, Business Enterprise Program

An Equal Opportunity Employer/Program

# Appendix E (Continued)

**Georgia Department of Labor's Response to Performance Audit**
**Subcontracts For Food Service Operations By The Business Enterprise Program**

Federal Subcontracted Food Service Operations are the subject of this Performance Audit. These five operations are located at the following sites: the Atlanta Federal Center, the Federal Law Enforcement Training Center, Warner Robins Air Force Base, Fort Benning Army Post, and Fort Gordon Army Post. All five of these facilities are federal contract sites and thus are governed by the federal Randolph-Sheppard Act, administered by the United States Department of Education.

The findings outlined in the DOAA Performance Audit reflect concerns similar to those raised by the U.S. Senate Committee on Health, Education, Labor and Pensions (HELP) in its October 20, 2005 report entitled, "*Opportunities for Too Few? Oversight of Federal Employment Programs for Persons with Disabilities.*" The DOAA findings illustrate deficiencies in the Randolph-Sheppard Act (R-S Act), which gives certain persons who are legally blind (licensed blind vendors), training, support and a priority to obtain and operate certain food service facilities on federal property. The Senate Committee's findings state that.

> " . . . too few persons with disabilities obtain employment opportunities under these two federal programs that will enable them to move into competitive employment. As part of the Committee's oversight responsibilities, the Committee will begin to consider legislative and other alternatives for improving these federal programs."

Alternatives identified in the Senate report include:

1. Combining the Randolph-Sheppard and Javits-Wagner-O'Day into a single program to increase the efficiency and effectiveness of both programs and increase the opportunities provided for those living with disabilities.
2. Including all persons living with disabilities in the combined program.
3. Creating incentives and opportunities for integrated, competitive employment. The more employment opportunities that are created, the more individuals the combined programs will be able to assist.
4. Providing training and job placement consistent with a person's capabilities and goals.
5. Requiring accountability, based on outcomes. These programs as currently administered need greater oversight and accountability.

The DOAA Performance Audit does not encompass any programs operating under the Javits-Wagner-O'Day Act, which addresses the needs of those with severe disabilities. Nor has the Georgia Department of Labor developed a position regarding the combination of such programs. However, the Senate Committee's comments regarding the Randolph-Sheppard Act are instructive in pointing out the weaknesses of the enabling legislation of the Act and the administration and oversight by the U. S. Department of Education.

While the Business Enterprise Program (BEP) has evolved to include oversight of complex food service contracts and processes with annual revenues of about $35 million, the actual administration of the program, especially in the area of federal funding, has changed little since its inception in 1936. The program was originally designed to deal with small-scale snack bar operations limited to gum, chips and cigarettes. The HELP Committee's investigation revealed that the U. S. Department of Education, the

1

# Appendix E (Continued)

federal agency responsible for administering Randolph-Sheppard, is providing poor management and oversight of this program. No federal evaluation mechanisms, standards, expectations, or comparative data are provided to the states. BEP management recognizes the acute need for additional federal support in administering the program. The Georgia BEP program, like such programs in other states, has struggled to meet the complex requirements and restrictions imposed by military and other large federal cafeteria contracts in the absence program guidance from the U.S. Department of Education regarding these contracts. In spite of these challenges, Governor Sonny Perdue and former Merit System Commissioner Marjorie Young have recognized the state's BEP program for its hard work in getting the job done for Georgia.

The federal government provides no additional administrative direction or funding to support oversight of the large cafeteria operations that have been added to the program since the 1980s, creating what amounts to an unfunded federal mandate. In order to address the shortcomings of this program, the Georgia Department of Labor made a state budget request to secure additional personnel necessary to manage the administration of the subcontract portion of the program, and to train blind vendors to function independently of teaming partners.

**Findings and Agency Responses**

DOAA's Summary Finding:
"Although the Program has assumed responsibility for overseeing complex food service contracts with annual revenues of about $35 million, it continues to operate as if it were only responsible for administering the operation of snack bars and vending machines."

*GDOL's Response:*
*The R-S Act was passed at a time when vending locations were simple operations, with small, one-person facilities involving limited cash flow and profit. While the law has not been substantially amended in over thirty years, the variety and complexity of vendor operation has increased exponentially. Federal guidance, as well as funding for administration and oversight, has lagged far behind the needs of the program.*

*The law was amended in 1974 to create opportunities for blind vendors to operate large federal cafeterias. Subsequently, blind vendors pursued their legal right of access to those contracts. Despite the absence of federal guidance or additional resources, the Georgia Department of Human Resources, which administered the BEP program until 2001, made the decision to support blind vendors in their efforts to achieve their full employment potential.*

*In its findings, DOAA fails to recognize the perseverance, efforts and achievements of the Blind Vendor community. Georgia's Blind vendors have overcome challenges, prejudices, biases and obstacles to find meaningful employment to support themselves and their families*

DOAA's Finding No. 1
"As currently administered, the Program's food service contracts may not be in keeping with the purpose and 'spirit' of the Randolph-Sheppard Act."

2

# Appendix E (Continued)

*GDOL's Response.*
*The stated purpose of the Randolph-Sheppard Act, 20 USC 107 et seq., is:*

> *"Providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting, blind persons licensed under the provisions of this chapter shall be authorized to operate vending facilities on any Federal property."*

*GA's BEP program is in compliance with the purpose and spirit of the Act. The Georgia program has: expanded opportunities for blind vendors; has allowed blind vendors to achieve to achieve one of the highest annual incomes of any state program; and it is the only state program in the nation that has instituted a goal of expanding the employment of persons with disabilities to 20% within five years.*

*The federal regulations regarding cafeterias do nothing more than create the blind vendors' priority and authorize the state programs to pursue the cafeteria contracts. The regulations do not address in any way the dramatically increased requirements to compete for and operate large cafeterias.*

*All other states that oversee federal cafeteria contracts for blind vendors utilize private "teaming partners" to assist the blind vendors in managing these contracts. As a practical matter the support provided by teaming partners is essential to the ability of the blind vendors to succeed in the operation of large cafeterias made available under the Randolph-Sheppard Act. While such an approach has the advantage of allowing a blind vendor to accept the opportunities provided by the federal government, the weaknesses and lack of federal statutory and regulatory guidelines for the utilization of teaming partners are reflected in state programs nationwide, as documented by the U. S. Senate HELP Committee.*

DOAA's Finding No. 2
"The Program is not using its food service subcontracts to benefit the maximum number of blind vendors. In addition, the Program has not taken action to increase the number of blind and disabled individuals employed under the subcontracts."

*GDOL's Response:*
*The National Council for State Agencies for the Blind recognized the Georgia BEP as the only program in the U.S. with a specific goal regarding employment of people with disabilities. All cafeteria contracts in Georgia include the goal of building a workforce with a minimum of 20% of the employees being persons with disabilities. In addition, the Georgia BEP has committed to retaining and creating vending facilities providing opportunities for more than one vendor, even when the national trend is to eliminate those "multi-vendor" facilities.*

DOAA's Finding No. 3
"The Program is not ensuring that contract managers are making progress towards the Program's goal that the subcontracted facilities eventually be taken over and operated by blind vendors."

*GDOL's Response:*
*Federal contracting requirements imposed by the U. S. Department of Defense and other federal agencies with large cafeteria operations include stringent requirements regarding education, years of experience*

3

# Appendix E (Continued)

*and capitalization to perform its contracts. While the program anticipates blind vendors moving toward qualification under those requirements, extensive experience and the acquisition of adequate cash reserves will extend the period for blind vendors to qualify for fully independent operation of the cafeteria contracts. The Department made a budget request to fund the hiring a Training Specialist. This specialist will develop and implement training for blind vendors, putting them in better position to independently operate large food service operations.*

DOAA's Finding No. 4
"The Program has not developed procedures to ensure that the contract manager positions are filled by the most qualified persons."

*GDOL's Response:*
*The U. S. Department of Education, which administers the R-S Act, does not provide administrative guidelines or mechanisms for selecting contract managers. States, including Georgia, are left to themselves to devise a process for vendor selection. As required by the Act, Georgia relies on the active participation of the Committee of Blind Vendors to identify vendors to operate all vending facilities. When BEP first entered the cafeteria market, few, if any, vendors had the experience necessary to select contract managers. As Georgia obtains additional cafeteria facility contracts, more vendors will be available to select qualified contract managers able to operate those facilities.*

DOAA's Finding No. 5
"The Program's current process for selecting contract managers has resulted in some applicant's receiving an unfair advantage over other applicants."

*GDOL Response:*
*Again the lack of federal guidance, as well as limited experience among the members of the Committee of Blind Vendors who are charged with selecting vendors to operate large cafeteria contracts, has created limitations during the selection process. Clearly, those vendors who first began operating cafeteria contracts were the same vendors with the best background to select contract managers for new cafeteria facilities. As more vendors gain experience operating large contracts, the pool of applicants for new contract opportunities will expand.*

DOAA's Finding No. 6
"The Program has not ensured that the subcontracts with limited liability companies (LLC's) adequately protect the state's interests. The Fort Benning subcontract with an LLC leaves the state potentially liable for costs associated with food-borne illnesses."

*GDOL Response:*
*The LLC had in place a $12 million dollar policy of commercial liability insurance to protect against food-borne illness. The Department has been indemnified from the outset of this contract. Additionally, the Department has been named as an additional insured on this LLC commercial liability policy, at no cost to the State*

4

# Appendix E (Continued)

DOAA's Finding No. 7
"The Program has not ensured that all the subcontracts are contributing the standard 12% of net profits 'set-aside' that is typically contributed by blind vendors for Program operations."

*GDOL Response*
*As previously noted, the BEP lacks the staff, funding and expertise to adequately monitor large cafeteria contracts. However, as the DOAA draft report reflects, the net effect has been overpayment of set-aside amounts. In order to ensure comprehensive monitoring, the Department made a budget request of the General Assembly for funding to hire a Program Manager to handle oversight and monitoring of the contract food service operations. Due to the complex financial implications of these contracts within the blind vendor program, the Department is in need of specialized personnel to handle the financial oversight, review and monitoring of these contracts. There has been no substantial increase in funding over the past years to keep up with the demands of monitoring and administering this program.*

*In conclusion, the Georgia Blind Vendor Program lacks the funding, technical assistance, and administrative direction from the U.S. Department of Education necessary to address the shortcomings of the Act. Therefore, the Georgia Department of Labor asserts that the most effective way to address the inadequacies of the Act as identified in the Senate Committee's report and the DOAA's findings is to devolve to the states the right and authority to administer the program to meet the objectives of the Act rather than strengthening the authority of the U.S. Department of Education. States are the best entity to control and implement this program to create the greatest impact on its citizens.*

5

Performance Audit Operations Division

Established in 1971 as part of the Department of Audits and Accounts, the Performance Audit Operations Division conducts in-depth reviews of state programs. The purpose of these reviews is to determine the degree to which state programs are accomplishing their goals and objectives; provide measurements of program results and effectiveness; identify other means of achieving goals and objectives; evaluate efficiency in the allocation of resources; and assess compliance with laws and regulations.

For additional information or for copies of this report call 404-657-5220 or see our website: http://www.audits.state.ga.us/internet/pao/rpt_main.html

# Exhibit C

Medical and Public Health Law Site
DoD Directives

Department of Defense

# DIRECTIVE

NUMBER 1125.3

April 7, 1978

Incorporating Change 1, August 22, 1991

*ASD(FM&P)*

SUBJECT: Vending Facility Program for the Blind on Federal Property

References: (a) Randolph-Sheppard Vending Stand Act (49 Stat. 1559, as amended by Act of 3 August 1954) (P. L. 83-556, 68 Stat. 663, as further amended by P. L. 93-516 (88 Stat. 1622) 20 U.S.C. 107)

(b) Title 45, Code of Federal Regulations Chapter XIII, Part 1369

(c) DoD Directive 1125.3, "Preference to Blind Persons in Operating Vending Stands," August 15, 1963 (hereby canceled)

## 1. REISSUANCE AND PURPOSE

1.1. This Directive:

1.1.1. Reissues reference (c) to implement the provisions of references (a) and (b); and

1.1.2. Establishes within the Department of Defense:

1.1.2.1. Uniform policies for application of priority accorded the blind to operate vending facilities;

1.1.2.2. Requirements for satisfactory vending facility sites in DoD Component-owned or occupied buildings; and,

1.1.2.3. Vending machine income-sharing requirements on property under the jurisdiction of a DoD Component.

1.2. Reference (c) and Report Control symbols DD-M(AR)570 and DD-M(A)571 are hereby superseded and canceled.

2. APPLICABILITY

The provisions of this Directive apply to the Office of the Secretary of Defense, the Military Departments, and the Defense Agencies (hereafter referred to as "DoD Components") in the 50 States, the District of Columbia, Puerto Rico, American Samoa, Guam and the Virgin islands.

3. DEFINITIONS

Terms used in this Directive are defined in enclosure 1.

4. POLICY

In implementation of the Randolph-Sheppard Act, priority on DoD-controlled property will be extended to the blind as set out below:

4.1. The blind will be given a priority in establishment and operation of vending facilities.

4.2. The blind will be given a priority in award of contracts to operate cafeterias.

4.3. In conjunction with acquisition or substantial alteration or renovation of property, satisfactory sites will be provided for operation of blind vending facilities.

by contract will be given to State licensing agencies.

5. RESPONSIBILITIES

5.1. The Assistant Secretary of Defense (Force Management and Personnel (ASD(FM&P)) will monitor the overall DoD program and consult with DoD Components on all determinations:

5.1.1. That the granting of a priority to the blind would be adverse to the interests of the United States; and

5.1.2. To suspend or terminate a permit to operate a vending facility.

5.2. The Head of the DoD Component concerned, in monitoring its program shall:

5.2.1. Approve/disapprove State licensing agency applications for permits and the provision of satisfactory sites;

5.2.2. Consult with the on-site official on determinations that granting a priority to the blind would be adverse to the interests of the United States and on termination of contracts to operate a cafeteria; and

5.2.3. Where circumstances warrant, suspend or terminate a permit to operate a vending facility.

5.3. The On-site Official will be the point of contact with State licensing agencies and will:

5.3.1. Consult with State licensing agencies on articles and services to be provided;

5.3.2. Determine, when appropriate, that granting a priority to the blind would be adverse to the interests of the United States and justify this determination to the Secretary, U.S. Department of Education through the Head of the DoD Component;

5.3.3. Notify State licensing agencies of acquisition or substantial alteration or renovation of property;

5.3.4. Ensure that operators are in fact State licensed blind persons and that sighted employees and assistants are utilized only to the extent reasonably necessary; and

5.3.5. Negotiate with State licensing agencies on other matters indicated in enclosure 2.

6. REQUIREMENTS AND OPERATING PROCEDURES

DoD Component requirements and operating procedures are set forth in enclosure 2.

7. ARBITRATION

Whenever any State licensing agency for the blind determines that any activity of the Department of Defense is failing to comply with the provisions of the Act (reference (a)) and all informal attempts to resolve the issues have been unsuccessful, the State licensing agency may file a complaint with the Secretary, *U.S. Department of Education*, who will convene an ad hoc arbitration panel in accordance with the provisions of 45 CFR 1369.37 (reference (b)).

8. REPORTS REQUIRED

Within 90 days after the end of each fiscal year, DoD Components shall forward to the Assistant Secretary of Defense *(Force Management and Personnel)* the total number of applications for vending facility locations received from State licensing agencies, the number approved, the number denied, and number still pending, the total amount of vending machine income collected (as defined in enclosure 1, excluding income exempt from the income sharing requirements by subparagraph E2.1.5.3., enclosure 2), and the amount of such vending machine income disbursed to State licensing agencies in each State. These reporting requirements have been assigned Inter-

**agency Report Control Number 1270. *ED* -AN.**

**9. <u>EFFECTIVE DATE AND IMPLEMENTATION</u>**

**This Directive is effective immediately. It will be transmitted by the DoD Components intact and only Component implementing directions may be added. Forward two copies of implementing regulations to the Assistant Secretary of Defense *(Force Management and Personnel)* for approval within 90 days.**

Harold Brown

HAROLD BROWN
Secretary of Defense

**Enclosures - 3**

E1. <u>Definitions</u>
E2. <u>DoD Component Requirements and Operating Procedures</u>
E3. <u>List of State Licensing Agencies</u>

# E1. ENCLOSURE 1

## DEFINITIONS

E1.1.1. Blind Licensee. A blind person licensed by the State licensing agency to operate a vending facility on Federal or other property.

E1.1.2. Cafeteria. A food dispensing facility which provides a broad variety of prepared foods and beverages (including hot meals) primarily through the use of a serving line where the customer serves or selects for himself from displayed selections. A cafeteria may be fully automatic, self-service, or have limited waiter or waitress service. Table or booth seating facilities are always provided. DoD Component food dispensing facilities which conduct cafeteria-type operations during part of their normal operating day and full table-service operations during the

service operations.

E1.1.3. Direct Competition. The presence and operation of a DoD Component vending machine or a vending facility on the same premises as a vending facility operated by a blind vendor. Vending machines or vending facilities operated in areas serving employees, the majority

of time required to patronize the vending facility) to the vending facility operated by a blind vendor, will not be considered to be in direct competition with that vending facility.

E1.1.4. Federal Property. Any building, land, or other real property owned, leased, or occupied by any Department, Agency, or instrumentality of the United States.

E1.1.5. Head of the DoD Component. Deputy Secretary of Defense, Secretaries of the Military Departments and the Directors of Defense Agencies or their designees. For the Pentagon Building

DoD Component."

E1.1.6. Individual Location, Installation, or Facility. A single building or a self-contained group of buildings. A self-contained group of buildings means two or more buildings which are in close proximity to each other, and between which a majority of the Federal employees working in such buildings regularly move from one building to another in the normal course of their official business during a normal working day.

E1.1.7. Federal Employees. Civilian appropriated fund and non-appropriated fund employees of the United States.

E1.1.8. License. A written instrument issued by a State licensing agency to a blind person, authorizing that person to operate a vending facility on Federal or other property.

E1.1.9. Normal Working Hours. An 8-hour work period between the hours of 0800 and 1800 hours, Monday through Friday.

E1.1.10. ON-SITE OFFICIAL. The individual in command of an installation or separate facility or location. For the Pentagon Building only, the chairman of the Department of Defense

Concession Committee is designated as the on-site official.

E1.1.11. Permit. The official written approval to establish and operate a vending facility requested by and issued to a State licensing agency by a DoD Component.

E1.1.12. Satisfactory Site. An area fully accessible to vending facility patrons and having

in accordance with applicable health and building requirements. Effective March 23, 1977, a "satisfactory site" will have a minimum of 250 square feet available for sale of items and for storage of articles necessary for the operation of a vending facility, unless the Head of the DoD Component and the State licensing agency agree that a smaller or larger facility is appropriate.

E1.1.13. State. The 50 States, District of Columbia, Puerto Rico, American Samoa, Guam, and the Virgin Isands.

E1.1.14. State Licensing Agency. The State agency designated by the *U.S. Department of Education*, Commissioner of the Rehabilitation Services Administration to issue licenses to blind persons for the operation of vending facilities on Federal and other property.

E1.1.15. Substantial Alteration or Renovation. A permanent material change in the floor area of a building which would render it appropriate for the location and operation of a vending facility by a blind vendor.

E1.1.16. Vending Facility. Automatic vending machines, cafeterias, snack bars, cart services, shelters, and counters, which sell such items as newspapers, periodicals, confections, tobacco products, foods, beverages, and other articles and services to be dispensed automatically or manually and that are prepared on or off the premises in accordance with applicable health laws and further including the vending or exchange of chances for any lottery authorized by State law

full table-service operations.

E1.1.17. Vending Machine. For the purpose of assigning vending machine income, means a coin or currency operated machine that dispenses articles or services, except that machines providing services of a recreational nature, commonly referred to as amusement machines (e.g., jukeboxes, pinball machines, electronic game machines, pool tables, shuffle boards, etc.) and telephones, are not considered to be vending machines.

E1.1.18. Vending Machine Income. DoD Component receipts from DoD Component vending machine operations on Federal property, after deducting all applicable costs incurred (costs of goods, service, maintenance, repair, cleaning, depreciation, supervisory and administrative personnel, normal accounting, accounting for income-sharing, and so forth) where the machines are operated by any DoD Component activity; or commissions received (less applicable DoD Component costs) by any DoD Component activity from a commercial vending firm which

activity.

**E1.1.19. Vendor. A blind licensee who is operating a vending facility on Federal or other property.**

## E2. ENCLOSURE 2

## DoD COMPONENT REQUIREMENTS AND OPERATING PROCEDURES

E2.1.1. DoD Components will take necessary action to ensure that, within their areas of responsibility, the requirements set forth below are implemented.

E2.1.2. The blind have a priority right to operate vending facilities on DoD-controlled property when the opportunity to operate them becomes available. The priority extended allows blind licensees to be gainfully employed while primary responsibility for carrying out this intent falls upon the State licensing agency, it is nevertheless a responsibility of the on-site official to ensure that the operator is in fact a State licensed blind person and that sighted employees or assistants are utilized only to the extent reasonably necessary.

E2.1.2.1. This priority will not be accorded when the on-site official determines, after conferring with the Head of the DoD Component, that the interests of the United States would be adversely affected if the priority were accorded.

E2.1.2.2. Any determination that according the priority would be adverse to interests of the United States must be fully justified in writing through the Head of the DoD Component concerned (who will consult with the Assistant Secretary of Defense *(Force Management and Personnel) (ASD(FM&P))*. The justification then shall be sent to the Secretary, *U.S. Department of Education*, who has authority to determine whether the failure to accord the priority is justified by the circumstances. This determination by the Secretary, *U.S. Department of Education* must be published in the Federal Register and is binding upon the DoD Component.

E2.1.2.3. Applications for permits by the State licensing agency to operate vending facilities (except cafeterias) on DoD-controlled property must be submitted in writing to the Head of the DoD Component concerned, through the on-site official. When an application is not approved, the Head of the DoD Component will advise the State licensing agency in writing and will indicate the reasons for the disapproval. When issued, permits will describe the location of the vending facility and will be subject to the following requirements:

E2.1.2.3.1. The permit will be issued in the name of the State licensing agency.

E2.1.2.3.2. The permit will be issued for an indefinite period of time subject to suspension or termination upon failure to comply with agreed upon terms; and subject to termination by either party upon 60 days written notice to the other party, in cases of (a) inactivation of the installation or activity, (b) loss of use of a building or other facility housing the vending facility, (c) change in the DoD Component's requirements for service, or (d) inability of the State licensing agency to continue to operate the vending facility.

E2.1.2.3.3. The permit will provide that:

E2.1.2.3.3.1. No charge will be made by the DoD Component to the State

to the designated vending facility boundaries, or for trash removal from a designated collection point.

E2.1.2.3.3.2. The State licensing agency will be responsible for cleaning and maintaining the appearance of and for the security of the vending facility within the designated boundaries of such facility and for all costs of every kind in conjunction with vending facility equipment, merchandise and other products to be sold, except as provided in E2.1.2.3.3.5., below. Neither party will be responsible for loss or damage to the other's property, unless proximately caused by its acts or omissions. The State licensing agency will also be responsible for the acts or omissions of the blind vendor, his employees or agents.

E2.1.2.3.3.3. Articles sold at such vending facilities may consist of newspapers, periodicals, publications, confections, tobacco products, foods, beverages, chances for any lottery authorized by State law and conducted by an agency of a State within such State, and other articles or services traditionally found in blind operated vending facilities operated under the Randolph-Sheppard Act as determined by the State licensing agency in consultation with the on-site official, to be suitable for a particular location (articles and services may be dispensed automatically or manually);

E2.1.2.3.3.4. Vending facilities will be operated in compliance with applicable health, sanitation and building codes, ordinances, and regulations;

E2.1.2.3.3.5. Installation, modification, relocation, removal, and renovation of vending facilities will be subject to the prior approval of the on-site official and the State licensing agency. Costs of installation, modification, removal, relocation or renovation will be paid by the initiating party. In any case of suspension or termination of a permit to operate a vending facility

by the noncomplying party.

E2.1.2.3.4. The permit will also contain appropriate requirements for reimbursement or direct payment for support services such as utilities and telephone service.

E2.1.2.3.5. In the event the blind licensee fails to provide satisfactory service or otherwise fails to comply with the requirements of the permit issued to the State licensing agency, the on-site official will, after coordinating with the Head of the DoD Component, notify the State licensing agency of this deficiency in writing and request corrective action within a specified reasonable time. The notice will indicate that failure to correct the deficiency will result in temporary suspension or termination of the permit, as appropriate. Suspension or termination action will be taken by the Head of the DoD Component concerned after consultation with the *ASD(FM&P)*.

E2.1.3. The blind have a priority right to operate cafeterias on DoD-controlled property, as set out in E2.1.3.1. or E2.1.3.2., below, when the cafeteria operation involved is contracted.

E2.1.3.1. Procuring activity solicitations, when issued, will establish basic requirements and the criteria for judging proposals. One copy of each solicitation will be provided to the State licensing agency for the blind. The criteria upon which proposals will be evaluated may include factors such as sanitation practices, personnel, staffing, menu pricing and portion sizes, variety, budget and accounting practices, fees, and other relevant considerations.

E2.1.3.1.1. If the State licensing agency submits a proposal and it is not within the competitive range established by the contracting officer, award may be made to another offer or following normal procurement procedures, but only after the on-site official confers with the Head of the DoD Component.

E2.1.3.1.2. If the State licensing agency submits a proposal and it is within the competitive range established by the contracting officer, the contract will be awarded to the State licensing agency except as provided in E2.1.3.1.3., below.

E2.1.3.1.3. The contracting officer may award to other than the State licensing agency when the on-site official determines that award to the State licensing agency would adversely affect the interests of the United States and the Secretary, *U.S. Department of Education*, approves the determination (processing will be in accordance with E2.1.2., above), or when the on-site official determines, after conferring with the Head of the DoD Component, and the Secretary, *U.S. Department of Education*, agrees, that the blind vendor does not have the capacity to operate a cafeteria in such a manner as to provide food service at a comparable cost and of comparable high quality as that available from other providers of cafeteria services.

E2.1.3.2. Direct negotiations may be undertaken with State licensing agencies whenever the on-site official, with concurrence of the Head of the DoD Component, has determined that the State licensing agency, through its blind licensee, can provide the cafeteria services required at a reasonable cost, with food of a high quality comparable to that available from other providers of cafeteria services. In the event direct negotiations fail to result in a contract with the State licensing agency, the procedures prescribed in E2.1.3.1., above, will be followed.

E2.1.3.3. The operation of a cafeteria by a blind vendor will be governed by contractual agreement, not by a permit. Normal contract administration procedures will apply, except that termination actions will not be taken without prior coordination with the Head of the DoD Component concerned.

E2.1.3.4. All contracts for the operation of cafeterias on DoD-controlled property with other than State licensing agencies will, upon expiration, be processed under the above paragraphs unless the State licensing agency informs the on-site official that it is not prepared to exercise its priority at that time.

E2.1.4. Any DoD Component acquired (purchased, rented, leased, constructed), or substantially altered or renovated building is required to have one or more satisfactory sites (as defined in enclosure 1) for a blind-operated vending facility, except as provided in subparagraph E2.1.4.1., below.

E2.1.4.1. A determination that a building contains a satisfactory site or sites is presumed made if the State licensing agency and the on-site official consult and agree that the site or sites provided are satisfactory.

**E2.1.4.1.1. DoD Components will notify by certified or registered mail, return receipt requested, the appropriate State licensing agency (see enclosure 3) of buildings to be acquired or substantially altered or renovated. This notification will be provided at least 60 days in advance of the intended acquisition date or the initiation of actual construction, alteration or renovation. As a practical matter, the State licensing agency should be contacted early in the planning or design stage of a project. (This notice requirement does not apply in cases as described in subparagraph E2.1.4.1.1.3., below.) This notification will:**

**E2.1.4.1.1.1. Indicate that a satisfactory site or sites for the location and operation of a blind vending facility is included in the plans for the building,**

**E2.1.4.1.1.2. Forward a copy of a single line drawing indicating the proposed location of such site or sites,**

**E2.1.4.1.1.3. Assure the State licensing agency that, subject to the approval of the DoD Component involved, it will be offered the opportunity to select the location and type of vending facility to be operated by a blind vendor prior to completion of the final space layout of the building, and**

**E2.1.4.1.1.4. Also indicate that an unexplained response indicating that the State licensing agency does not desire to establish and operate a vending facility, or the absence of a response within 30 days will be construed by the DoD Component concerned as a determination by the State licensing agency that the number of persons using the property is or will be insufficient to support a vending facility.**

**E2.1.4.1.2. The State licensing agency must respond within 30 days acknowledging receipt of the correspondence from the DoD Component and indicating whether it is interested in**

**location and its selection of type of vending facility. A copy of the written notice to the State licensing agency and the State licensing agency's response, if any, will be provided to the Secretary, HEW.**

**E2.1.4.1.3. If the State licensing agency responds indicating that it does not desire to establish and operate a vending facility and sets forth any specific basis other than the insufficiency of persons to support a vending facility, then a satisfactory site which meets anticipated needs of the DoD Component will be incorporated. Each such satisfactory site will meet or exceed the requirements defined in enclosure 1.**

**E2.1.4.1.4. If an unexplained response indicating that the State licensing agency does not desire to establish and operate a vending facility is received, or if no response is received within the 30 day period, the on-site official will, through the Head of the DoD Component, notify the Secretary, *U.S. Department of Education*, that the State licensing agency's response or failure**

**persons using the property is or will be insufficient to support a vending facility and that a satisfactory site to be operated under the auspices of the State licensing agency will not be incorporated, unless directed by the Secretary, *U.S. Department of Education*. This notification will also be provided if the State licensing agency responds and affirmatively indicates that it has**

**made such a determination.**

E2.1.4.2. The Secretary, *U.S. Department of Education*, has determined that the requirement to provide a satisfactory site does not apply:

E2.1.4.2.1. When fewer than 100 Federal employees (as defined in enclosure 1) will be located in the building during normal working hours; or

E2.1.4.2.2. When the building contains less than 15,000 square feet to be used for Federal Government purposes in the case of a building in which services are to be provided to the general public.

E2.1.4.3. The provisions of E2.1.4.2.2., above, do not preclude arrangements under which vending facilities to be operated by blind vendors may be established in buildings of a size or with an employee population less than that specified. For example, if a building is to be constructed which would contain only 30 Federal employees, upon agreement of the on-site official and the State licensing agency, the DoD Component concerned may determine to provide a satisfactory site in which the blind have agreed to operate a vending facility.

E2.1.4.4. When a DoD Component is leasing all or part of a privately owned building in which the lessor or any of its tenants have an existing restaurant or other food facility in a part of the building not covered by the lease and operation of a vending facility would be in substantial direct competition with such restaurant or other food operation, the requirement to provide a satisfactory site does not apply.

E2.1.5. Effective January 2, 1975, vending machine income generated by the Department of Defense will be shared with State licensing agencies for the blind and/or blind vendors as set forth below. The on-site official is responsible for the collection of, and accounting for, such vending machine income (as defined in enclosure 1) and for otherwise ensuring compliance with the requirements of this paragraph.

E2.1.5.1. The vending machine income-sharing requirements are as follows:

E2.1.5.1.1. One hundred percent (100%) of the vending machine income from vending machines in direct competition with blind-operated vending facilities will be provided the State licensing agency.

E2.1.5.1.2. Fifty percent (50%) of the vending machine income from vending machines not in direct competition with blind-operated vending facilities will be provided the State licensing agency.

E2.1.5.1.3. Thirty percent (30%) of the vending machine income from vending machines not in direct competition with blind-operated vending facilities and located where at least 50 percent of the total hours worked on the premises occurs during other than normal working hours (as defined in enclosure 1) will be provided the State licensing agency.

E2.1.5.2. The determination of whether a vending machine is in direct competition with the blind-operated vending facility is the responsibility of the on-site official subject to the concurrence of the State licensing agency.

**E2.1.5.3. These vending machine income-sharing requirements do not apply to:**

**E2.1.5.3.1. Income from vending machines operated by or for the military exchanges or ships' stores systems; or**

**E2.1.5.3.2. Income from vending machines, not in direct competition with a blind-operated vending facility, at any individual location, installation, or facility (as defined in enclosure 1) where the total of the vending machine income (as defined in enclosure 1) from all such machines at such location, installation, or facility does not exceed $3,000 annually.**

**E2.1.5.4. The payment to State licensing agencies under these *income sharing requirements must be made quarterly on a fiscal year basis.***

# E3. ENCLOSURE 3

## STATE LICENSING AGENCIES

Alabama

Director
Vocational Rehabilitation
2129 E. South Boulevard
P.O. Box 11586
Montgomery, Alabama 36111
(205) 281-8780

Alaska

Director
Office of Vocational
Rehabilitation
Pouch F, Mail Station 0581
Juneau, Alaska 99811
(907) 586-6500

Arizona

Chief
Rehabilitation Services
Bureau
Dept. of Economic Security
1535 W. Jefferson,
Suite 155
Phoenix, Arizona 85007
(602) 271-3332

Arkansas

Commissioner
Dept. of Social &
Rehabilitation Services
1801 Rebsamen Park Road
P.O. Box 3781
Little Rock, Arkansas 72203
(501) 371-2571

California

Director
Dept. of Rehabilitation
830 K Street Mall
Sacramento, California 95814
(916) 445-3971

Colorado

Director
Division of Rehabilitation
Dept. of Social Services
1575 Sherman Street
Denver, Colorado 80203
(303) 892-2652

Connecticut

Director
Board of Education &
Services for the Blind
170 Ridge Road
Wethersfiled, Connecticut 06109
(203) 249-8525

Delaware

Delaware Bureau for the
Visually Impaired
Dept. of Health &
Social Services
305 W. Eight Street
Wilmington, Delaware 19801
(302) 571-3333

District of Columbia

Chief, Bureau of Rehab Services
Social and Rehabilitation
Administration
Dept. of Human Resources
122 C Street, N.W. - 8th Floor
Washington, D. C. 20001
(202) 629-5896

Florida

Office of Blind Services
Dept. of Education
2571 Executive Center
Circle East Howard
Building
Tallahassee, Florida 32301
(904) 488-1330

Georgia

Dept. of Human Resources
Division of Vocational
Rehabilitation
47 Trinity Avenue
Atlanta, Georgia 30334
(404) 656-2621

Guam

Chief
Division of Vocational
Rehabilitation
Government of Guam
Board for Control for
Vocational Rehabilitation
Dept. of Education
P.O. Box 10-C
Agana, Guam 96910
472-8806

Hawaii

Division of Vocational
Rehabilitation
Dept. of Social Services &
Housing
Room 216,
Queen Liliuokalani Bldg.
P.O. Box 339
Honolulu, Hawaii 96809
(808) 548-6367

Idaho

Administrator
Idaho Commission for
the Blind
Statehouse
Boise, Idaho 83720
(208) 384-3220

Illinois

Director
State of Illinois
Board of Vocational Education
and Rehabilitation
Div. of Vocational Rehabilitation
623 East Adams Street
Springfield, Illinois 62706
(217) 782-2093

Indiana

Indiana Rehabilitation Services
1028 Illinois Building
17 W. Market Street
Indianapolis, Indiana 46204
(317) 633-5687

Iowa

Commission for the Blind
Fourth and Keosauqua
Des Moines, Iowa 50309
(515) 283-2601

Kansas

Director
Services for the Blind and
Visually Handicapped
State Dept. of Social and
Rehabilitation Services
Biddle Building
2700 West 6 th Street
Topeka, Kansas 66606
(913) 296-4454

Kentucky

Assistant Superintendent
of Public Instruction
for Rehabilitation
Bureau of Rehabilitative Services
Capital Plaza Office Tower
Frankfort, Kentucky 40601
(502) 564-4440

Louisiana

Louisiana Health and Human
Resources Administration
Division of Family Services
755 Riverside North
P.O. Box 44065
Baton Rouge, Louisiana 70804
(504) 389-5596

Maine

Bureau of Rehabilitation
32 Winthrop Street
Augusta, Maine 04330
(207) 289-2266

Maryland

Assistant State Superintendent
Div. of Vocational Rehabilitation
Box 8717, Baltimore-Washington
International Airport
Baltimore, Maryland 21240
(301) 796-8300

Massachusetts

Massachusetts Commission
for the Blind
110 Tremont Street
Boston, Massachusetts 02108
(617) 727-5580

Michigan

Dept. of Social Services
Office of Services for the Blind
300 S. Capitol Avenue
Lansing, Michigan 48926
(517) 373-2062

Minnesota

State Services for the Blind and
Visually Handicapped
1745 University Avenue - 1st Floor
St. Paul, Minnesota 55104
(612) 296-6034

Mississippi

Vocational Rehabilitation
for the Blind
P.O. Box 4872
Jackson, Mississippi 39216
(601) 354-6412

Missouri

Dept. of Social Services
Division of Family Services
Broadway State Office Building
Jefferson City, Missouri 65101
(314) 751-4249

Montana

Administrator
Visual Services Division
Dept. of Social & Rehabilitation
Services
P.O. Box 1723
Helena, Montana 59601
(406) 449-3434

Nebraska

Director, Div. of Rehabilitation
Services for the Visually Impaired
1047 South Street
Lincoln, Nebraska 68502
(402) 471-2891

Nevada

Bureau of Services for the Blind
State Dept. of Human Resources
308 North Curry Street, Room 200
Carson City, Nevada 89701
(702) 885-4444

New Hampshire

State Department of Education
Div. of Vocational Rehabilitation
105 Loudon Road, Bldg. No. 3
Concord, New Hampshire 03301
(603) 271-3121

New Jersey

Executive Director
Commission for the Blind and
Visually Impaired
1100 Raymond Boulevard
Newark, New Jersey 07102
(201) 648-2324

New Mexico

Assistant Superintendent for
Vocational Rehabilitation
Department of Education
231 Washington Avenue
P.O. Box 1830
Santa Fe, New Mexico 87503
(505) 827-2266

New York

State Dept. of Social Services
Commission for the Visually
Handicapped
10 Eyck Office Building
40 North Pearl Street
Albany, New York 12203
(518) 474-6739

North Carolina

Director
Div. of Services for the Blind
N.C. Dept. of Human Resources
410 N. Boylan Avenue
P.O. Box 2658
Raleigh, North Carolina 27602
(919) 829-4231

Ohio

Administrator
Rehabilitation Services
Commission
4656 Heaton Road
Columbus, Ohio 43229
(614) 466-7790

North Dakota

Div. of Vocational Rehabilitation
1025 N. 3rd Street, Box 1037
Bismarck, North Dakota 58501
(701) 224-2907

Oklahoma

Administrative Assistant Dept. of
Institutions, Rehabilitative Services
Social & Rehabilitative Services
Division of Rehabilitative and
Visual Services
P.O. Box 25352
Oklahoma City, Oklahoma 73125
(405) 521-3374

Oregon

Administrator
Commission for the Blind
535 S.E. 12th Avenue
Portland, Oregon 97214
(503) 238-8375

Pennsylvania

Commonwealth of Pennsylvania
Dept. of Public Welfare
Bureau of the Visually Handicapped
Dept. of Public Institutions
Capital Association Bldg., Rm 31
P.O. Box
2675 Harrisburg, Pennsylvania 17120
(717) 787-6176

Rhode Island

Administrator Vocational
Rehabilitation
40 Fountain Street
Providence, Rhode Island 02903
(401) 421-7005

Puerto Rico

Assistant Secretary for Vocational
Rehabilitation
Dept. of Social Services
P.O. Box 1118
Hato Rey, Puerto Rico 00919
(809) 723-1792

South Carolina

Executive Director
Commission for the Blind
P.O. Box 11638, Capitol Station
Columbia, South Carolina 29211
(803) 758-2595

South Dakota

State Director
Dept. of Social Services
Div. of Rehabilitative Services
State Office Building, Illinois
Pierre, South Dakota 57501
(605) 224-3195

Tennessee

Div. of Services for the Blind
Dept. of Human Services
303-304 State Office Building
Nashville, Tennessee 37219
(615) 741-3163

Texas

Executive Director
State Commission for the Blind
800 City National Bank Building
Austin, Texas 78711
(512) 474-1901

Utah

Administrator
Div. of Rehabilitation Services
Utah State Board of Education
250 East Fifth South
Salt Lake City, Utah 84111
(801) 533-6814

Vermont

Div. for the Blind & Visually
Handicapped
Dept. of Social and Rehabilitation
Services
81 River Street
Montpelier, Vermont 05602
(802) 828-2747

Virginia

Virginia Commission for the
Visually Handicapped
3003 Parkwood Avenue
Richmond, Virginia 23221
(804) 786-2181

Virgin Islands

Dept. of Social Welfare
Div. of Vocational Rehabilitation
P.O. Box 539
St. Thomas, Virgin Islands 00801

Washington

Office of Services for the Blind
Dept. of Social & Health Services
3411 South Alaska Street
Seattle, Washington 98118
(206) 464-6690

West Virginia

Div. of Vocational Rehabilitation
P&G Building, Washington Street
Charleston, West Virginia 25305
(304) 345-2375

Wisconsin

Administrator
1 West Wilson Street, Room 720
Madison, Wisconsin 53702
(608) 266-1683

Wyoming

Administrator
Div. of Vocational Rehabilitation
Hathaway Building, West Cheyenne,
Wyoming 82002
(307) 777-7387

Trust Territory

Office of the High Commissioner
Trust Territory of the Pacific Islands
Saintan, Mariana
Islands 96550 9422

American Samoa

Assistant to the Governor of
American Samoa
Pago Pago, American Samoa
96799
633-0166

# Exhibit D

The purpose of the FEIS was to analyze and disclose the potential environmental consequences of the disposal of real property and the reuse of the base outside the area retained by the US Air Force.

The Air Force issued a Record of Decision (ROD) on May 19, 1995, which documented a series of decisions in regard to parcel disposal, the organizations or agencies to receive certain parcels; the means for parcel disposal (Federal transfer, public benefit conveyance, negotiated sale, or public sale); and the mitigation measures to be adopted. The Air Force issued a Supplemental Record of Decision (SROD) on April 23, 1996, which clarified that the base electrical system would be disposed of by negotiated sale. The SROD also, made modifications to the ROD concerning the size of various parcels of land to be transferred to the Army and the Rickenbacker Port Authority (RPA).

Since the SROD was issued, the RPA and other Federal agencies have requested that the SROD and ROD be revised to reconcile certain property disposal decisions. Consequently, this RSROD adjusted the acreage of various parcels of land and clarified the intended disposal of the water and waste water sewer system to the RPA.

These disposal activities and any associated mitigation measures will proceed with minimal adverse impact to the environment. This action conforms with applicable Federal, State and local statutes and regulations, and all reasonable and practical efforts have been incorporated to minimize harm to the local public and the environment.

Any questions regarding this matter should be directed to Mr. John P. Carr, Program Manager at (703) 696–5547. Correspondence should be sent to: AFBCA/DA, 1700 North Moore Street, Suite 2300, Arlington, VA 22209–2802.

**Barbara A. Carmichael,**

*Alternate Air Force Federal Register Liaison Officer.*

[FR Doc. 97–19934 Filed 7–28–97; 8:45 am]

BILLING CODE 3910–01–P

## DEPARTMENT OF DEFENSE

### Department of the Navy

### Notice of Deadline for Submission of Donation Application for the Aircraft Carrier Ex-MIDWAY (CV 41)

**SUMMARY:** The Department of the Navy hereby gives notice of the deadline of November 12, 1997 for submission of a donation application for the Multi-Purpose Aircraft Carrier ex-MIDWAY (CV 41), located at the Naval Inactive Ship Maintenance Facility, Bremerton, Washington, under the authority of 10 U.S.C. Section 7306. Eligible recipients include: (1) Any State, Commonwealth, or possession of the United States or any municipal corporation or political subdivision thereof; (2) the District of Columbia; or (3) any not-for-profit or nonprofit entity. Transfer of a vessel under this law shall be made at no cost to the United States Government. The transferee will be required to maintain the vessel in a condition satisfactory to the Secretary of the Navy as a static museum/memorial. Prospective transferees must submit a comprehensive, detailed application addressing their plans for managing the significant financial, technical, and environmental responsibilities that accompany ships donated under this program.

**FOR FURTHER INFORMATION CONTACT:** Ms. Gloria Carvalho, Congressional and Public Affairs Office, Naval Sea Systems Command, NAVSEA 00D1C, 2531 Jefferson Davis Hwy, Arlington, VA 22242–5160, telephone number (703) 602–1575.

Dated: July 18, 1997.

**M.D. Sutton,**

*LCDR, JAGC, USN, Federal Register Liason Officer.*

[FR Doc. 97–19844 Filed 7–28–97; 8:45 am]

BILLING CODE 3810–FF–P

## DEPARTMENT OF DEFENSE

### Department of the Navy

### Notice of Intent To Grant Exclusive License; M.E. Harris & Company

**SUMMARY:** The Department of the Navy hereby gives notice of its intent to grant to M.E. Harris & Company a revocable, nonassignable, exclusive license in the United States to practice the Government owned inventions described in: U.S. Patent Number 5,190,624 entitled Electrorheological Fluid Chemical Processing; U.S. Patent Number 5,194,181 entitled Process for Shaping Articles from Electrosetting Compositions; U.S. Patent Number 5,518,664 entitled Programmable Electroset Processes; U.S. Patent Pending; Navy Case Number 75,833 entitled Programmable Electroset Materials and Process.

Anyone wishing to object to the grant of this license has 60 days from the date of this notice to file written objections along with supporting evidence, if any. Written objections are to be filed with the Naval Surface Warfare Center, Carderock Division, Code 004, 9500 MacArthur Blvd., West Bethesda, MD 20817–5700.

**FOR FURTHER INFORMATION CONTACT:** Mr. Dick Bloomquist, Director, Technology Transfer, Naval Surface Warfare Center, Carderock Division, Code 0117, 9500 MacArthur Blvd., West Bethesda, MD 20817–5700, telephone number (301) 227–4299.

Dated: July 16, 1997.

**M. D. Sutton,**

*LCDR, JAGC, USN, Federal Register Liaison Officer.*

[FR Doc. 97–19832 Filed 7–28–97; 8:45 am]

BILLING CODE 3810–FF–P

## DEPARTMENT OF EDUCATION

### Arbitration Panel Decision Under the Randolph-Sheppard Act

**AGENCY:** Department of Education.

**ACTION:** Notice of arbitration panel decision under the Randolph-Sheppard Act.

**SUMMARY:** Notice is hereby given that on June 11, 1996, an arbitration panel rendered a decision in the matter of *Mississippi Department of Rehabilitation Services* v. *United States Department of Defense, Department of the Air Force (Docket No. R-S/94-3).* This panel was convened by the U.S. Department of Education pursuant to 20 U.S.C. 107d–1(b), upon receipt of a complaint filed by the Mississippi Department of Rehabilitation Services.

**FOR FURTHER INFORMATION CONTACT:** A copy of the full text of the arbitration panel decision may be obtained from George F. Arsnow, U.S. Department of Education, 600 Independence Avenue, SW., Room 3230, Mary E. Switzer Building, Washington, DC 20202–2738. Telephone: (202) 205–9317. Individuals who use a telecommunications device for the deaf (TDD) may call the TDD number at (202) 205–8298.

**SUPPLEMENTARY INFORMATION:** Pursuant to the Randolph-Sheppard Act (20 U.S.C. 107d–2(c)), the Secretary publishes in the **Federal Register** a synopsis of arbitration panel decisions affecting the administration of vending facilities on Federal and other property.

### Background

On or about June 24, 1993, the U. S. Department of Defense, Department of the Air Force (Air Force), issued a request for proposals (RFP) for full food services at Keesler Air Force Base, Mississippi. The Mississippi Department of Rehabilitation Services, State licensing agency (SLA), responded

EXHIBIT D

40510 **Federal Register** / Vol. 71, No. 136 / Monday, July 17, 2006 / Notices

supporting statement. Any additional comments on this ICR should be submitted to EPA and OMB within 30 days of this notice.

EPA has established a public docket for this ICR under Docket ID No. EPA–HQ–OW–2002–0053, which is available for online viewing at *www.regulations.gov*, or in person viewing at the Water Docket in the EPA Docket Center (EPA/DC), EPA West, Room B102, 1301 Constitution Ave., NW., Washington, DC. The EPA Docket Center Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Reading Room is (202) 566–1744, and the telephone number for the Water Docket is (202) 566–2426.

Use EPA's electronic docket and comment system at *www.regulations.gov*, to submit or view public comments, access the index listing of the contents of the docket, and to access those comments in the docket that are available electronically. Once in the system, select "docket search," then key in the docket ID number identified above. Please note that EPA's policy is that public comments, whether submitted electronically or in paper, will be made available for public viewing at *www.regulations.gov* as EPA receives them and without change, unless the comment contains copyrighted material, CBI, or other information whose public disclosure is restricted by statute. For further information about the electronic docket, go to *www.regulations.gov*.

*Title:* NPDES Stormwater Program Phase II.

*ICR numbers:* EPA ICR No. 1820.04, OMB Control No. 2040–0211.

*ICR Status:* This ICR is scheduled to expire on September 30, 2006. Under OMB regulations, the Agency may continue to conduct or sponsor the collection of information while this submission is pending at OMB. An Agency may not conduct or sponsor, and a person is not required to respond to, a collection of information, unless it displays a currently valid OMB control number. The OMB control numbers for EPA's regulations in title 40 of the CFR, after appearing in the **Federal Register** when approved, are listed in 40 CFR part 9, are displayed either by publication in the **Federal Register** or by other appropriate means, such as on the related collection instrument or form, if applicable. The display of OMB control numbers in certain EPA regulations is consolidated in 40 CFR part 9.

*Abstract:* This ICR calculates the burden and costs associated with the regulation of stormwater discharges under Phase II of the NPDES stormwater program. Specifically, it calculates the burden associated with small MS4 stormwater permits, small construction (1–5 acres) permits and waivers, and the no-exposure certification (EPA form 3510–11) available to industrial facilities. The ICR also specifies the burden on authorized NPDES States to process and administer the Phase II program.

*Burden Statement:* The annual public reporting and recordkeeping burden for this collection of information is estimated to average 14 hours per response. Burden means the total time, effort, or financial resources expended by persons to generate, maintain, retain, or disclose or provide information to or for a Federal agency. This includes the time needed to review instructions; develop, acquire, install, and utilize technology and systems for the purposes of collecting, validating, and verifying information, processing and maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements which have subsequently changed; train personnel to be able to respond to a collection of information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information.

*Respondents/Affected Entities:* Entities potentially affected by this action are NPDES permittees, including operators of small municipal separate storm sewer systems, small construction activity, and industrial facilities identified in 40 CFR 122.26(b)(14)(i)–(ix) and (xi) that qualify for a no exposure exemption.

*Estimated Number of Respondents:* 135,908.

*Frequency of Response:* Varies.

*Estimated Total Annual Hour Burden:* 3,696,276 hours.

*Estimated Total Annual Cost:* $157,922,968, includes $0 annualized capital or O&M costs.

*Changes in the Estimates:* The estimated decrease in burden is 1,262,076 hours compared to the total estimated burden hours currently identified in the OMB Inventory of Approved ICR Burdens. This change is primarily the result of the decrease in the estimated size of the regulated universe (based on EPA's estimate of the number of construction sites affected by this information collection).

Dated: July 8, 2006.

**Oscar Morales,**

*Director, Collection Strategies Division.*

[FR Doc. E6–11253 Filed 7–14–06; 8:45 am]

BILLING CODE 6560–50–P

---

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OEI–2006–0515; FRL–8198–1]**

### Agency Information Collection Activities; Proposed Collection; Comment Request; Confidentiality Rules (Renewal); EPA ICR No. 1665.07, OMB Control No. 2020–0003

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice.

**SUMMARY:** In compliance with the Paperwork Reduction Act (PRA) (44 U.S.C. 3501 *et seq.*), this document announces that EPA is planning to submit the following continuing Information Collection Request (ICR) to the Office of Management and Budget (OMB). This ICR is scheduled to expire on November 30, 2006. Before submitting the ICR to OMB for review and approval, EPA is soliciting comments on specific aspects of the proposed information collection as described below.

**DATES:** Comments must be submitted on or before September 15, 2006.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–HQ–OEI–2006–0515, by one of the following methods:

- *www.regulations.gov*: Follow the on-line instructions for submitting comments.
- Email: *docket.oei@epa.gov*.
- Fax: 202–566–0224.
- Mail: Office of Environmental Information Docket (OEI), Environmental Protection Agency, Mailcode: 2822T, 1200 Pennsylvania Ave., NW., Washington, DC 20460.
- Hand Delivery: 1301 Constitution Ave., NW., Washington, DC 20460, Room B102. Such deliveries are only accepted during the Docket's normal hours of operation, and special arrangements should be made for deliveries of boxed information.

*Instructions:* Direct your comments to Docket ID No. EPA–HQ–OEI–2006–0515. EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *www.regulations.gov*, including any personal information provided, unless the comment includes information claimed to be Confidential Business