**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Bid Protest**

| | | |
|---|---|---|
| **BROWN & PIPKINS, LLC,**<br>**doing business as**<br>**ACSENTIAL SERVICES,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL ACTION**<br>**FILE NO. 06-732C**<br><br>**Judge Lawrence M. Baskir** |

**PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD/SUPPLEMENTAL MOTION FOR PERMANENT INJUNCTION, AND DECLARATORY RELIEF AND MANDAMUS**

James W. Copeland (Georgia Bar No. 186780)
S. Gregory Joy (Georgia Bar No. 405495)
**SMITH, CURRIE & HANCOCK LLP**
2700 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, Georgia 30303-1227
Telephone (404) 521-3800
Facsimile (404) 688-0671

Attorneys for Brown & Pipkins, LLC,
doing business as Acsential Services

## Table of Contents

**I. Introduction** ..... 1

**II. QUESTIONS INVOLVED IN CASE AND INTRODUCTION** ..... 1

**III. REPLY TO DEFENDANT'S STATEMENT OF FACTS** ..... 2

**IV. ARGUMENT AND DISCUSSION OF AUTHORITY** ..... 4

**A. The Government's Motion Should be Denied And B&P's Motion Should Be Granted Because B&P Has Satisfied the Standard For Review And Reversal Of The Army's Decision To Award To The SLA Because The Army's Decision-making Process Was Arbitrary, An Abuse Of Discretion, Or Otherwise Not in Accordance With Law.** ..... 4

**1. The Army's discretion is not unlimited and decisions which are arbitrary, an abuse of discretion, or contrary to law are subject to injunctive relief.** ..... 4

**2. Injunctive relief is appropriate in this case because the Army's conduct was arbitrary, an abuse of discretion, and contrary to applicable law** ..... 6

**a. B&P's protest is justified on the merits because the Army failed to establish a competitive range or determine that the SLA's proposal was within the competitive range as required by the applicable regulations and authorities.** ..... 6

**b. B&P's protest is also justified on the merits because the SLA's price proposal is so much higher than B&P's proposal, the SLA's proposal**

**could not fall within a reasonable competitive range.** ........ 11

**d. The SLA's proposal failed to provide clear information as required by the Solicitation** ........ 18

**e. B&P's protest is timely** ........ 19

**3. B&P would suffer immediate and irreparable harm without injunctive relief while the public interest would not be adversely affected.** ........ 22

**4. The public interest is served by a permanent injunction** ........ 23

**5. The balance of hardships favors a permanent injunction because the injunction would not pose substantial harm to others or harm the public interest.** ........ 24

**B. Contrary To The Government's Contention, This Court Has The Authority To Issue Declaratory Relief To Direct Award Of The Contract To B&P.** ........ 25

**C. A Writ Of Mandamus Is Available In This Bid Protest Case.** ........ 27

**V. CONCLUSION** ........ 28

Appendix of Exhibits:

Exhibit A Affidavit of Deidre Brown

Exhibit B Department of Defense, Department of Education, and Committee For Purchase From People Who Are Blind Or Severely Disabled Joint Report dated August 29, 2006 to Congress Under Section 848 Of The National Defense Authorization Act For Fiscal Year 2006: Application Of The Javits-Wagner-O'Day Act And The Randolph-Sheppard Act To The Operation And Management Of Military Dining Facilities Contracts

# Table of Authorities

## Cases

*A & D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 132-33 (2006) ........ 26

*Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987) ........ 6

*Asia Pacific Airlines v. United States*, 68 Fed Cl. 8, 27 (2005) ........ 26

*Asia Pacific Airlines v. United States*, 68 Fed. Cl. 8, 19 (2005) ........ 5

*Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303 (2000) ........ 10, 11

*Carter III Service Corp. v. NASA*, 950 F.Supp. 357 (D.D.C. 1996) ........ 22

*Cleveland v. United States*, 9 Cl Ct 749 (1986) ........ 25

*Daluz v. United States*, 73 Fed. Cl. 129 (2006) ........ 27

*Duncan v. United States*, Case No. 04-1691C, 2006 WL 44173 (Fed. Cl. 2006) ........ 27

Gentex Corp. v. United States, 58 Fed. Cl. 634, 638 (2003) ........ 5

*Georgia Gazette Pub. Co. v. U.S. Department of Defense*, 562 F.Supp. 1004, 1010 (S.D. Ga. 1993) ........ 23

*Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 370 (2004) ........ 26

*Griffy's Landscape Maintenance LLC v. United States*, 46 Fed. Cl. 257, 261 (2000) ........ 26, 28

*Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 958 (Fed. Cir. 1993) ........ 10

*Magnavox Electronics Systems Co. v. United States*, 26 Cl.Ct. 1373, 1379 (Cl.Ct. 1992) ........ 22

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) ........ 6

*Randolph – Sheppard Vendors of America v. Weinberger*, 602 F. Supp. 1007 (D.D.C. 1985) ........ 8

*Randolph-Sheppard Vendors of American v. Harris*, 628 F.2d 1364 (D.C. Cir. 1980) ........ 5

*Westin v. McDaniel*, 769 F.Supp. 1563, 1569 (M.D. Ga. 1991 .......................................... 22

## Statutes

10 U.S.C. § 2305(a)(3)(A) .............................................................. 13, 14

20 U.S.C. § 107d-3(e) .......................................................................... 20

20 U.S.C. § 107e .................................................................................. 20

28 U.S.C. § 1491(b)(1) (2000) ............................................... 6, 30, 32, 34

41 U.S.C. § 253a(c)(1)(B) .............................................................. 13, 14

Pub.L. No. 104-320, §§ 12(a)-(b)m 110 Stat. 3870, 3874 (1996) ………….6

## Other Authorities

Federal Register, vol. 62, , No. 145, Pages 40509-40510 ......................... 15

Department of Defense, Department of Education, and Committee
For Purchase From People Who Are Blind Or Severely Disabled
Joint Report dated August 29, 2006 to Congress Under Section 848
Of The National Defense Authorization Act For Fiscal Year 2006:
Application Of The Javits-Wagner-O'Day Act And The
Randolph-Sheppard Act To The Operation And Management
Of Military Dining Facilities Contracts ………………………………14, 15, 16

# PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD/SUPPLEMENTAL MOTION FOR PERMANENT INJUNCTION, DECLARATORY RELIEF AND MANDAMUS

## I. INTRODUCTION

Brown & Pipkins, LLC, doing business as Acsential Services ("B&P") provides this Response Memorandum in Opposition to Defendant United States' Motion for Judgment upon the Administrative Record ("Government's Motion") and Reply Memorandum in Support of B&P's Motion for Judgment upon the Administrative Record and Supplemental Motion For Permanent Injunction, Declaratory Relief and Mandamus regarding Solicitation No. W911SE-05-R-0013 ("Solicitation") for the full food services requirement at Ft. Gordon, Georgia ("Project").

## II. QUESTIONS INVOLVED IN CASE AND INTRODUCTION

The questions involved in this case are set out in B&P's November 22, 2006 Memorandum In Support Of Motion For Judgment Upon The Administrative Record/Supplemental Motion For Permanent Injunction, And Declaratory Relief and Mandamus ("Supplemental Memorandum").

## III. REPLY TO DEFENDANT'S STATEMENT OF FACTS

The facts relevant to this protest are set out in the Supplemental Statement of Relevant Facts in B&P's Memorandum. While many of the material facts of this case are not in dispute, there are several assertions of fact by the Government in its Response and Cross-Motion which mis-characterize the Army's evaluation process and which, when viewed in proper context, show that the Government's evaluation process violated the applicable evaluation requirements.

The Government acknowledges at point 10 of its Statement of Facts that the Army's evaluation board met on May 1, 2006, reviewed and evaluated proposals for technical acceptability and found that B&P's and the State Licensing Agency's ("SLA") proposals were the only two proposals that were deemed technically acceptable. However, the Government then jumps in point 11 to June 9, six weeks later, when "the Army conducted a price/cost analysis of the proposals in response to the solicitation." The Government then asserts at point 12 that the "contracting officer reviewed the source selection evaluation report and the cost/price analysis and determined that'[t]he proposals submitted by the SLA and [B&P] were the only acceptable proposals, so in essence, they were the competitive range." The Government further suggests in point 14 that

"[o]nce [the contracting officer] learned that there were two technically acceptable proposals, she followed the evaluation criteria in the solicitation and completed a price/cost analysis."

This juxtaposition of points improperly suggests that the Army made the technical acceptability and price evaluations at the same time as part of a "de facto" competitive range evaluation when, in fact, the price evaluation was not performed for six weeks or as part of a competitive range analysis. The Contracting Officer states in her Statement that "[n]o competitive range was established. In this case, the offeror had to be technically acceptable to be further considered. Cost/pricing had not been evaluated for any proposals as yet." (Administrative Record ("AR") Tab 23, page 987) See also Post Negotiation Memorandum, "because the solicitation indicated that award without discussions was intended and the Contracting Officer has determined that discussions are not necessary, a competitive range was not established; . . .." (AR Tab 14, page 919)

The Army also does not point out in its Statement of Facts that the Government decided to award to the SLA despite the fact that the SLA's proposal price was $5,677,772.00 (over 16 percent) higher than the price submitted by B&P. (AR Tab 28, page 1040, ¶11) The Government claims in point 14 that the contracting officer took B&P's price proposal into

account in determining that the SLA's price was reasonable citing AR 918-919. This argument has no support in the Administrative Record and is not credible because it would be illogical for the Army to find a proposal price 16% and over $5.677 million higher than B&P's to be reasonable.

## IV. ARGUMENT AND DISCUSSION OF AUTHORITY

### A. The Government's Motion Should be Denied And B&P's Motion Should Be Granted Because B&P Has Satisfied the Standard For Review And Reversal Of The Army's Decision To Award To The SLA Because The Army's Decision-making Process Was Arbitrary, An Abuse Of Discretion, Or Otherwise Not in Accordance With Law.

#### 1. The Army's discretion is not unlimited and decisions which are arbitrary, an abuse of discretion, or contrary to law are subject to injunctive relief.

B&P agrees with the Government's statement that post-award bid protest are judged based on the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104-320, §§ 12(a)-(b)m 110 Stat. 3870, 3874 (1996), 28 U.S.C. § 1491(b)(1) (2000), which applies the Administrative Procedures Act standard of review. 5 U.S.C. § 706(2)(A). That standard provides that a reviewing court "shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . .." *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 394 (2005). The court should overturn a

procurement decision where "'(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Asia Pacific Airlines v. United States*, 68 Fed. Cl. 8, 19 (2005), citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

While some deference is to be afforded the agency, that deference and the agency's discretion is not unlimited and actions which are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with applicable law are to be overturned. *Asia Pacific*, *supra*. In the context of the Randolph–Sheppard Act ("RSA"), the court found in *Randolph-Sheppard Vendors of American v. Harris*, 628 F.2d 1364 (D.C. Cir. 1980), that the RSA does not provide an unqualified priority in favor of blind vendors or the SLA's representing them. As the Court stated in that case:

> It would be unreasonable to require agency heads to grant unqualified priorities to blind vendors to operate cafeterias, despite the vendor's anticipated cost. In fact such a scheme, unlike the present one, would actually exceed the authority delegated to the Secretary by the Amendment.

*Id*. at 1367.

In this case, the Administrative Record and undisputed facts show that Army's actions were arbitrary, an abuse of discretion and violated applicable regulations because (1) the Army did not apply the proper

competitive range analysis required under the RSA, (2) the Army failed to ensure that the SLA's cafeteria services would be performed by a blind vendor and instead seeks to award the contract to an SLA whose work would be operated by a non-blind vendor, and (3) the SLA's proposal did not provide proper responses to many of the Solicitation pricing requirements.

**2. <u>Injunctive relief is appropriate in this case because the Army's conduct was arbitrary, an abuse of discretion, and contrary to applicable law</u>**

Permanent injunctive relief is appropriate where: (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief. *See Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 546 n. 12 (1987)**;** *PGBA, LLC v. United States***,** 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

**a. B&P's protest is justified on the merits because the Army failed to establish a competitive range or determine that the SLA's proposal was within a competitive range as required by applicable regulations and authorities.**

The Government's argument regarding the competitive range analysis hinges on its contention that Army regulation "permits contracting

officials to acquire services through either direct negotiations or competitive procedures." The Government argues that the Army could conduct negotiations without making a determination that the SLA's proposals was in the competitive range if the "on-site" official determines that the SLA can provide the cafeteria services at a reasonable cost and of a high quality." Government Brief at page 21. That is not the procedure required by regulation. The regulations at DOD Directive 1125.3 state:

> E2.1.3.1.1. If the State licensing agency submits a proposal and it is not ***within the competitive range*** established by the contracting officer, award may be made to another offeror following normal procurement procedures, but only after the on-site official confers with the Head of the DoD Component.
>
> E2.1.3.1.2. If the State licensing agency submits a proposal and it is ***within the competitive range*** established by the contracting officer, the contract will be awarded to the State licensing agency except as provided in E2.1.3.1.3., below.
>
> E.2.1.3.1.3. The contracting officer may award to other than the State licensing agency when the on-site official determines that award to the State licensing agency would adversely affect the interests of the United States and the Secretary, U.S. Department of Education, approves the determination (processing will be in accordance with E2.1.2., above), or when the on-site official determines, after conferring with the Head of the DoD Component, and the Secretary, U.S. Department of Education, agrees, that the blind vendor does not have the capacity to operate a cafeteria in such a manner as to provide food service at a comparable cost and of a comparable high quality as that available from other providers of cafeteria services.

> E2.1.3.2. Direct negotiations may be undertaken with State licensing agencies whenever the on-site official, with concurrence of the Head of the DoD Component, has determined that the State licensing agency, through its blind licensee, can provide the cafeteria services required at a reasonable cost, with food of a high quality comparable to that available from the other providers of cafeteria services. In the event direct negotiations fail to result in a contract with the State licensing agency, the procedures prescribed in E2.1.3.1., above, will be followed. (see Exhibit C to B&P's Supplemental Memorandum) (emphasis added)

The Army did not have the discretion to begin direct negotiations with the SLA until it made a proper determination that the SLA's proposal was within the competitive range including finding that the SLA could provide high quality service comparable to B&P <u>and</u> at a reasonable cost. See *Department of the Air Force – reconsideration*, 72 Comp. Gen. 241 (June 4, 1993) at 244, citing *Randolph – Sheppard Vendors of America v. Weinberger*, 602 F. Supp. 1007 (D.D.C. 1985), *judgment vacated on other grounds*, 795 F.2d 90 (D.C. Cir. 1986) (the SLA's bid must be judged to be within the competitive range and the RSA does not give the SLA an absolute right to receive the award without regard to the contract criteria or the merit of other bidders); *Randolph – Sheppard Vendors,* 628 F.2d 1364, 1367 (D.C. Cir. 1980) (the agency must determine that the SLA's bid falls within "a reasonable and competitive range"). Therefore, the Army did not have the authority to proceed with direct negotiations with the SLA without

first determining whether the SLA's proposal was within the competitive range.

Moreover, the Solicitation provides that it is subject to competition limited to eligible 8(a) concerns (AR Tab 1, Page 28) and that it was a competitive acquisition pursuant to FAR 52.215-1. (AR Tab 1, Page 37) "[T]he [S]olicitation indicated that award without discussions was intended and the Contracting Officer has determined that discussions are not necessary." (AR Tab 14, Page 919; see also AR Tab 1, Page 39, subsection (f)(4)) Therefore, even if the Government's assertion that the Army could have conducted negotiations directly with the SLA outside the competitive process, the Army chose in the Solicitation not to follow that route. Therefore, any assertion that the Government did not have to apply the competitive range analysis because it had the option of conducting direct negotiations is inapplicable in this case.

The Army did not establish the required competitive range or perform the required range analysis. The Government's contends that a competitive range was established, relying on the contracting officer's assertion that the Army had "in essence" established a competitive range simply because it made a determination that the B&P and SLA proposals were technically acceptable. However, the contracting officer admits in her

Statement that "***[n]o competitive range was established.*** In this case, the offeror had to be technically acceptable to be further considered. Cost/pricing had not been evaluated for any proposals as yet." (AR Tab 23, page 987) (emphasis added) See also Post Negotiation Memorandum, "a competitive range was not established; . . .." (AR Tab 14, page 919)

Thus, the Army, by its own admission, did not establish a competitive range. And it is clear that the Army could not have established a competitive range based solely on a finding of technical acceptability of the proposals. Pricing must be considered as part of the competitive range analysis. See *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303, 338 (2000) ("It is well-established that price must always be a factor in an agency's decision to award a contract. 10 U.S.C. § 2305(a)(3)(A); 41 U.S.C. § 253a(c)(1)(B); FAR § 15.304(c)(1). Moreover, an agency may not discount the importance of price in a price/technical tradeoff to such an extent that it "effectively renders the price factor meaningless." *Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 958 (Fed. Cir. 1993) The Government's Brief suggests it recognizes that pricing had to be evaluated to establish the competitive range because the Government Brief claims the Army evaluated price before conducting negotiations with the SLA when the Army actually had not done so as discussed above. The

Army's failure to evaluate pricing as part of a competitive range analysis is by itself an abuse of discretion and a violation of the regulatory requirement for establishing the competitive range.

**b. B&P's protest is also justified on the merits because the SLA's price proposal is so much higher than B&P's, the SLA's proposal could not fall within a reasonable competitive range.**

Even if the Army had evaluated pricing as part of a competitive range analysis, it could not have reasonably found that the SLA's pricing was within the competitive range. As discussed in B&P's prior Memoranda, price proposals must be considered as part of the competitive range analysis. In *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303 (2000), the Court of Federal Claims held that:

> It is well-established that price must always be a factor in an agency's decision to award a contract. 10 U.S.C. § 2305(a)(3)(A); 41 U.S.C. § 253a(c)(1)(B); FAR § 15.304(c)(1).

48 Fed. Cl. at 338. *See also SCIENTECH, Inc.,* Comp. Gen. Dec. B-277805.2, 98-1 CPD ¶ 33.

A price proposal that is over 14 percent higher than other technically acceptable price proposals is not within the competitive range and should be disregarded. See, e.g., Federal Register, vol. 62, No. 145, Pages 40509-40510, Arbitration Panel Decision Under Randolph-Sheppard Act in

*Mississippi Dep't of Rehabilitative Services vs. United States Dept of Defense* (finding that an SLA's bid that was materially higher than other bidders was properly excluded from competitive range consideration). (See Exhibit D attached to B&P's Supplemental Memorandum)

The DOD has recognized that price differentials for SLA proposals under the RSA need to be no more than five percent (5%) to be considered for award. The Department of Defense ("DOD"), the Department of Education ("DOE"), and the Committee For Purchase From People Who Are Blind Or Severely Disabled ("CFP") issued a Joint Report in August 2006 to Congress under Section 848 Of The National Defense Authorization Act For Fiscal Year 2006: Application of the Javits-Wagner-O'Day Act and the Randolph-Sheppard Act to the Operation and Management of Military Dining Facilities Contracts, a copy of which is attached hereto at Exhibit B. That Report provides a joint policy statement for the application of the RSA to the operation and management of dining facilities. The DOD, DOE and CFP have agreed that it is their joint policy for DOD dining facility contracts to be awarded on full and fair competition applying the RSA with direct negotiations to be used if the only available source is a state licensing agency. The SLA receives a priority under the RSA when the state licensing agency demonstrates that (1) it can provide

the operation at a "fair and reasonable price" with food of high quality comparable to that available from other providers of cafeteria services and comparable to the quality and price of food currently provided to military service members and (2) the state licensing agency's proposal is among the highly ranked final proposal revisions with a reasonable chance of being selected for award. (See Exhibit B, page 5.) The term "fair and reasonable price" means "the State licensing agency's final proposal revision does not exceed the offer that represents the best value (as determined by the contracting officer after applying its source selection criteria in the solicitation) by more than five percent of that offer, or one million dollars, whichever is less, over all performance periods required by the solicitation." (See Exhibit B hereto, page 5)

This procedure is being applied on other DOD contracts. (See portions of solicitation for Andrews Air Force Base cafeteria services contract attached at Exhibit A-1 to the Affidavit of Deidre Brown at Exhibit A attached hereto.)

In this case, the best value is clearly B&P's technically acceptable proposal at $35,045,235.00. The SLA's proposal is nearly triple the five percent difference allowed by the joint policy of the DOD, DOE and CFP. Therefore, the SLA's proposed price is excessive and could not fall within a

reasonable competitive range whether that range be 14 percent or five percent higher than B&P's price.

The Government contends that the Army properly evaluated the SLA's price by determining that the SLA's price was lower than the Government's estimate and only two percent higher than the incumbent's cost of services. However, the Army's estimate and incumbent's price are not the appropriate standards for determining whether the SLA's proposed price is excessive. The appropriate comparison is to the technically acceptable proposals submitted by others in response to the solicitation as indicated in *Mississippi Dep't of Rehabilitative Services* and in the DOD/DOE/CFP Joint Report. If the Government's proposed price comparison methods was applied to other competitive bidding situations then the Government could award to any proposer, including the proposer with the highest price, without regard to lower competing prices so long as the highest price is within the Government's estimate. Clearly, that violates the spirit and regulatory requirement for award based on the competitive pricing, and would expose the Government to significantly higher prices and penalize other bidders. This also discourages competition from other bidders who cannot succeed even though their prices are significantly

lower thereby reducing contracting opportunities for other contractors and further injuring the Government.

In this case, the SLA's price proposal was over $5.67 million and over 16 percent higher than B&P's price proposal. And the difference between B&P's and the SLA's proposals may be even greater. The Army's Cost Price Memorandum states the SLA's proposal could be as high as approximately $41,913,031. (AR Tab 13, pages 902-04) This would amount to a difference of over 19.25% from B&P's proposal.

Therefore, the SLA's proposal should never have reached the point of being subject to direct negotiations because its pricing was clearly not within a reasonable competitive range under the RSA regulations.

**c. Injunctive relief is proper because the Army has failed to follow regulations requiring that it ensure the SLA's operations will be performed by a blind vendor.**

The Government contends that the issue of whether the SLA has submitted a proposal on behalf of a blind vendor is not appropriate for a bid protest but rather should be left to the state licensing agency. However, the applicable DOD regulations state that the installation commander, as the designated on-site official "will . . .[e]nsure that operators are in fact State licensed blind persons and that sighted employees and assistants are utilized only to the extent reasonably necessary." Army Regulation 210-

25(4)(c)(4) (See Exhibit C attached hereto. Thus, the Army has a duty to ensure that the person actually operating the service is a State licensed blind person. The agency has the last opportunity and ability to evaluate whether the SLA's proposal is in accordance with the RSA, providing true benefit to the blind, not a front for non-blind vendors. 20 U.S.C. § 107d-3(e) provides that the U.S. Secretary of Education may "establish a priority for the ***operation*** of cafeterias on Federal property by blind licensees." (emphasis added) The statute requires that the licensee be blind as defined in 20 U.S.C. § 107e. The contracting officer in this case has also recognized that "[f]ederal law states (RSA) that a preference is given in favor of firms **operated** by blind persons for various vending services (to include full food services) on installations operated by Executive Branch Agencies." (AR Tab 23, page 986) (emphasis added)

However, it is clear from the Administrative Record in this case that the Army determined the work was not being performed by the blind vendor. The Army states that the SLA's proposal calls for work to be performed by a non-blind entity, BCI, not by the blind vendor licensee identified by the SLA, Franklin Hulsey. The Army's Price/Cost Analysis Report states, "***[t]he actual contractor performing the work is***

***Blackstone Consulting, Inc.*** . . . . (AR Tab 13, page 903; see also Post Negotiation Memorandum at AR Tab 14, page 916)

As noted in B&P's Supplemental Memorandum, nothing in the Administrative Record identifies Mr. Hulsey as having any role in the Project other than lending his name and perhaps collecting some of the fee. Nothing in the SLA's proposal indicates Mr. Hulsey has operational control as all personnel are under "BCI General Managers". (AR Tab 7, page 100), and the Quality Control & Safety Manager and the Assistant Food Service Manager, designated by the SLA as the "key personnel" (AR Tab 7, page 97) would be BCI employees. (AR Tab 7, pages 98-99)

BCI is not a blind vendor but rather maintains it is a "teaming partner" for blind vendors. (See Exhibit A to B&P's Supplemental Memorandum)

The Army's decision to accept the SLA's proposal while knowing that the cafeteria services would be run by a non-blind enterprise is a direct violation of the Army's duties under Army Reg. 210-25(4)(c)(4). That violation justifies a finding that the Army has acted arbitrarily and in violation of applicable regulations.

The impropriety of award to the SLA when the Army knows a non-blind vendor will be running the operation is reinforced by the Georgia Department of Audits and Accounts finding that the Georgia SLA Program

is not in keeping with the RSA's purpose because "blind vendors only serve as contract managers; they do not actually operate facilities or provide any food services." Georgia Department of Audits and Accounts Report 05-09, *Performance Audit: Subcontracts For Food Service Operations by the Business Enterprise Program Department Of Labor*, Dec. 2005, page 6, a copy of which is attached at Exhibit B to B&P's Supplemental Memorandum. That report also notes "there is no indication that any of the [blind] contract managers will ever assume responsibility for actually operating the subcontracted food service facilities." *Id*. at 7.

Therefore, the Army has an obligation in the proposal review process to "ensure" that the operator will be a State licensed blind persons, and the Army's own statements in its proposal evaluation paperwork show that will not happen. The SLA's proposal should not even be considered under the RSA and injunctive relief is appropriate in light of the Army's failure to follow procurement requirements to ensure that the operations are performed by a blind vendor.

**d. <u>The SLA's proposal failed to provide clear information as required by the Solicitation</u>**

The Army's determination to award to the SLA should also be enjoined because the SLA's proposal failed to comply with several requirements of the Solicitation as the Record shows. The Army found that

the SLA's proposed pricing was unclear and its proposal was defective because the SLA: (1) did not total proposed hours; (2) apparently did not include contractor furnished material costs of $1,200,000 in the total proposal amount; and (3) did not show the computation of fee in its summary breakdown per year or by building. The Army could not tell what the SLA's proposed price really was (other than to know it was at least $5.67 million higher than B&P's.) (AR Tab 13, page 903)

Such errors in a proposal render the proposal non-responsive. A proposal that fails to conform to material terms of the solicitation should be deemed unacceptable and not form the basis for an award. *Hawkins & Powers Aviation, Inc.,* Comp. Gen. Dec. B-244360, 91-2 CPD ¶ 313.

**e. B&P's protest is timely**

The Government contends that B&P's protest is not timely because B&P should have known that the Solicitation was subject to the RSA and that the Army would follow the procedures set out in the Solicitation so B&P should have protested prior to the proposal submission date. This argument sets up a straw man not applicable to B&P's protest. B&P is not protesting the fact that the Solicitation is subject to the RSA. B&P recognizes that the RSA can be applied to cafeteria services contracts.

B&P also does not protest the evaluation procedures set out in the Solicitation.

Rather, B&P protests the failure of the Army to follow the required procedures. The Solicitation indicates the Army will follow procedures applicable to the RSA which are embodied in DOD 1125.3. As such, B&P reasonably anticipated that the Army would follow the regulatory requirement (also recognized in the cases cited above) that the Army would establish a proper competitive range before conducting negotiations. It is the Army's failure to follow the required procedures that the Solicitation indicates it will follow that is the basis for this protest. B&P could not have known before notice of award and the debriefing from the Army on August 24, 2006, when the Army first explained to B&P that it had not applied a competitive range analysis (see Deidre Brown affidavit at Exhibit A to B&P's initial Memorandum (AR Tab 28, page 1041) and Verified Complaint (AR Tab 29, page 1049)), that the Army had failed to follow its own required competitive range evaluation procedures. B&P filed its protest to the GAO within one day of the debriefing and then timely protested to this Court.

B&P did not know until the Administrative Record was issued in November 2006 that the Army found that the SLA's proposal was based on

work to be performed by a non-blind vendor. Again, B&P included that basis for its protest within a few days after receiving the Administrative Record.

B&P maintains that award to the SLA is improper because the Army evaluated that proposal which failed to respond properly to the cost information required by the Solicitation. B&P could not have known that the SLA's proposal failed to include the proper information prior to proposal submission. Moreover, B&P did not know about that information until it received the Administrative Record. Therefore, B&P's protest is timely.

Furthermore, protests based on alleged improprieties in a solicitation are generally not time barred in this Court even if raised after contract award. *Transcontinental Lines LLC v. United States*, 68 Fed. Cl. 48, 52 (2005). The GAO timeliness rules do not apply in this Court, *id.*, unless "appropriate circumstances exist." Such circumstances generally require that the protestor is challenging the terms of the solicitation rather than the evaluation of proposals. *ABF Freight System, Inc. v. United States*, 55 Fed. Cl. 392, 399-400 (2003). In this case, B&P is not protesting the terms of the Solicitation, but rather the Army's failure to properly evaluate proposals in accordance with the regulations to which the Solicitation was

subject. Therefore, the GAO timing limits regarding challenges to the terms of the Solicitation have no application to this case.

### 3. <u>B&P would suffer immediate and irreparable harm without injunctive relief while the public interest would not be adversely affected.</u>

The Government contends that B&P has not made a showing of irreparable harm. "Irreparable harm" has been defined as an injury for which there exists "no adequate remedy at law, meaning that the injury must be actual and imminent, not remote and speculative, and requires a remedy of more than money damages." *Westin v. McDaniel*, 769 F.Supp. 1563, 1569 (M.D. Ga. 1991.

Injunctive relief is appropriate in this case because if B&P is excluded from providing the food services at Fort Gordon, B&P will lose the opportunity to compete for the contract award and will lose over $1.6 million profits thereunder. (Affidavit of Deidre Brown attached hereto at Exhibit A.) B& P cannot recover these lost profits; only bid preparation and proposal costs can be recovered. This lost opportunity to compete and loss of profits is a basis for an injunction. *Magnavox Electronics Systems Co. v. United States*, 26 Cl.Ct. 1373, 1379 (Cl.Ct. 1992); *Carter III Service Corp. v. NASA*, 950 F.Supp. 357 (D.D.C. 1996).

Furthermore, the denial of the opportunity to have one's proposal fully and equally considered demonstrates irreparable harm justifying an injunction. *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 370, (2004); *Georgia Gazette Pub. Co. v. U.S. Department of Defense*, 562 F.Supp. 1004, 1010 (S.D. Ga. 1993). As discussed above, the Army has failed to adhere to the required competitive range analysis, thereby depriving B&P of its opportunity to compete for these work requirements on a fair playing field. Therefore, injunctive relief is necessary to prevent irreparable harm to B&P.

#### 4. <u>The public interest is served by a permanent injunction</u>

The Government claims that the public interest would be injured because it would defeat the goal of providing a priority for blind vendors. On the contrary, allowing award based on the process employed by the Army in this case defeats the purposes of the RSA by failing to follow the applicable regulations for all of the reasons set forth in Section III. A of this Memorandum. Moreover, award to the SLA would not promote blind vendors because the real operational control and benefit will be to a non-blind contractor.

There will be no substantial harm to the public or interested persons if a permanent injunction is issued. The Army would receive the food

services they need and the Army would save over $5.67 million dollars if award to the SLA is enjoined and particularly if the contract is awarded to B&P. Injunction of award to the SLA and award to B&P would also serve to promote the 8(a) set-aside for which this Project was designated. Therefore, a permanent injunction would actually serve the public interest.

**5. <u>The balance of hardships favors a permanent.</u>**

The Government contends that the balance of hardships disfavors injunctive relief because the SLA is being denied the opportunity to work as envisioned by the RSA. However, the RSA did not envision award to an SLA without following the regulatory requirements or award to an SLA with a price over 16 percent higher than the price proposed by another technically acceptable proposer. Injunctive relief will actually promote the proper and fair administration of the RSA, thereby benefiting the Army and the public by preventing a waste of over $5.67 million and encouraging non-blind vendors to continue to bid for cafeteria services because they believe they will be treated fairly in the evaluation process.

The Army also contends that preventing award to the SLA would require an extension of the existing contract and "may push" the schedule of the procurements beyond the period for extending the existing contracts which could risk incurrence of fiscal law violations. Government Brief at 41-

42. There is no evidence presented by the Army to support these alleged risks. Moreover, there is no factual showing or citation to any authority suggesting that the Army runs any real risk from extending the existing contract. Most importantly, the Government's concerns about extending the existing contract would be ameliorated by direction to the Army to award the contract to B&P as the only 8(a) contractor submitting a technically acceptable proposal at a cost-saving of more than $5.67 million.

**B. Contrary To The Government's Contention, This Court Has The Authority To Issue Declaratory Relief.**

The Government maintains that this Court does not have the authority to issue a declaratory judgment directing award to B&P. Government Brief at page 42. However, the cases relied on by the Government either are not bid protest cases or predate the 1996 changes to 28 U.S.C. § 1491(b) giving this Court broad remedies.

In contrast to the authorities relied on by the Government, bid protest remedies have been governed by 28 U.S.C. § 1491(b) since 1996. That statute provides that the Court of Federal Claims has jurisdiction over bid protest cases and further states at subsection (2):

> To afford relief in such an action, the courts may award ***any relief*** that the court considers proper, including ***declaratory*** and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs. (emphasis added)

This Court has authority to award "any relief" that it believes is appropriate specifically including declaratory relief (such as a declaration that the contract should be awarded to B&P). Such relief may not be available in non-bid protest cases, but 28 U.S.C. §1491(b)(2) provides broad authority for the Court to award "any relief" the Court deems proper (other than monetary relief beyond bid preparation and proposal costs).

This Court has in the past specifically vacated an award and directed the Army to reevaluate proposals and to make a new award. See *Griffy's Landscape Maintenance LLC v. United States*, 46 Fed. Cl. 257, 261 (2000). This Court has also issued broad injunctive relief prohibiting an agency from awarding a contract to any bidder other then the protester, *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 370 (2004) and *Asia Pacific Airlines v. United States*, 68 Fed Cl. 8, 27 (2005).

In the context of a bid protest, the same standard for injunctive relief applies to declaratory relief. *A & D Fire Protection, Inc. v. United States*, 72 Fed. Cl. 126, 132-33 (2006). B&P has satisfied the requirements for a permanent injunction and declaratory relief. In light of the Army's failure to apply properly the required competitive range analysis and the fact that B&P has submitted the only other technically acceptable proposal (which is more than $5.67 million lower than the SLA's), the Court should enter a

permanent injunction preventing Defendant from preceding with award of a contract for the Project to anyone other than B&P and issue a declaratory judgment finding that the Army's evaluation procedure was arbitrary and abuse of discretion and not in accordance of law and that the award should be made to B&P.

**C. <u>A Writ Of Mandamus Is Available In This Bid Protest Case.</u>**

The Government also contends that this Court does not have jurisdiction to issue a writ of mandamus relying on *Daluz v. United States*, 73 Fed. Cl. 129 (2006). In *Daluz*, the court dealt with a claim by a former federal employee seeking a retroactive temporary promotion and money damages. *Daluz* was not a bid protest case.

As noted above, 28 U.S.C. § 1491(b) provides that the Court of Federal Claims can award ***any relief*** that the court considers proper, except that monetary relief shall be limited to bid preparation and proposal costs. "Any relief" would logically include mandamus.

Furthermore, this Court has found that mandamus may be appropriate in certain circumstances. In *Duncan v. United States*, Case No. 04-1691C, 2006 WL 44173 (Fed. Cl. 2006), Judge Smith found a writ of mandamus would be appropriate if: (1) the moving party has no other means to obtain the relief it desires; (2) the moving party has satisfied the

burden of showing that its right to the issuance of the writ is clear and undisputable; and (3) the issuing court is satisfied that the writ is appropriate under the circumstances. For the reasons cited above, B&P meets these three criteria.

Even if the Court did not have jurisdiction to issue a writ of mandamus, it should issue such other declaratory relief allowed by 28 U.S.C. § 1491(b)(2) to vacate the award and to direct that award not be made to a proposer other than B&P. *Griffy's Landscape, supra; Great Lakes Dredge & Dock, supra.* The Court has authority to issue mandamus-like relief even if it could not specifically issue a writ of mandamus.

## V. CONCLUSION

In light of the foregoing facts and authorities, B&P respectfully requests that this Honorable Court deny the Government's Motion and issue a judgment in favor of B&P and against Defendant and its agencies, officers, servants, employees, and agents (specifically the Department of the Army, the Secretary of Defense, the Secretary of the Army, the Contracting Officers, and their successors):

1) permanently enjoining Defendant from proceeding with performance of a new contract for the Food Services Project pursuant to the Solicitation by anyone other than B&P;

2) declaring any contract issued pursuant to the Solicitation to anyone other than B&P void, and further declaring that the contract pursuant to the Solicitation is to be awarded to B&P;

3) issuing a writ of mandamus directing Defendant to award any contract issued pursuant to the Solicitation to B&P; and

4) providing such other and further relief as this Court determines is appropriate.

DATED this 29[tht] day of December, 2006.

Respectfully submitted,

**SMITH, CURRIE & HANCOCK LLP**

By s/S. Gregory Joy
James W. Copeland (Georgia Bar No. 186780)
S. Gregory Joy (Georgia Bar No. 405495)
2700 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, Georgia 30303-1227
Telephone (404) 521-3800
Facsimile (404) 688-0671

**SMITH, CURRIE & HANCOCK LLP**
2700 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, Georgia 30303-1227
Telephone (404) 521-3800
Facsimile (404) 688-0671

Attorneys for Brown & Pipkins, LLC, doing business as Acsential Services

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD/SUPPLEMENTAL MOTION FOR PERMANENT INJUNCTION, AND DECLARATORY RELIEF AND MANDAMUS is being electronically filed with the Clerk of Court this 29th day of December, 2006 using the CM/ECF system which will send e-mail notification of such electronic filing to the following counsel of record for defendant: Kenneth David Woodrow, Esquire

By s/ S. Gregory Joy
S. Gregory Joy
(Georgia Bar No. 186780)

SMITH, CURRIE & HANCOCK LLP
2700 Marquis One Tower
245 Peachtree Center Avenue
Atlanta, Georgia 30303-1227
Phone: (404) 521-3800
Facsimile: (404) 688-0671