No. 06-732C
(Judge Baskir)

---

BID PROTEST
IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BROWN & PIPKINS, LLC,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

---

# DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

PATRICIA M. MCCARTHY
Assistant Director

KENNETH D. WOODROW
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 353-0513
Facsimile: (202) 514-7969

Attorneys for Defendant

OF COUNSEL:

CHRISTOPHER L. KRAFCHEK
CAPT., JA
Contract & Fiscal Law Division
Trial Attorney, Team III
901 N. Stuart St., Suite 500
Arlington, VA 22203
Telephone: 703-696-2804
Facsimile: 703-696-1535

January 10, 2007

# TABLE OF CONTENTS

PAGE

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The Contracting Officer Correctly Evaluated The Proposals Pursuant To The "Lowest Cost Technically Acceptable" Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. The Terms Of The Solicitation Did Not Require The Contracting Officer To Establish A Competitive Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. The Contracting Officer Properly Evaluated Pricing When It Determined That The SLA's Proposed Price Was Reasonable . . . . . . . . . . . . . . . . . . 6

C. The Price Differential Between The Offers Of B&P And The SLA Is Not *Per Se* Unreasonable . . . . . . 7

1. Authorities Cited By B&P Do Not Support the Conclusion That Price Differential Is *Per Se* Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

2. DOD Policy Statement Could Not Have Been Considered By The Contracting Officer And Is Irrelevant To This Court's Inquiry . . . . . . . . . . . . . 8

II. The Contracting Officer Properly Found The SLA's Bid To Comply With The Terms Of The Solicitation . . . . . . . 10

A. The Concept Of "Responsiveness" Is Not Applicable To Negotiated Procurements . . . . . . . . . . . . . . . . . . . . 10

B. The Contracting Officer Acted Within Her Discretion When Communicating With The SLA To Clarify Its Proposal . . . . . . . . . . . . . . . . . . . . . 11

C. The Army Complied With Regulations Requiring It To Contract With State-Licensed Blind Vendors . . . . . . . 12

1. Army Regulation 210-25 Does Not Establish An Independent Duty To Evaluate Whether The SLA's Proposal Complies With The Randolph-Sheppard Act . . . . . . . . . . . . . . . . . . 12

2. The Army Contracting Agency's Randolph-Sheppard Act Policy Does Not Discuss Any Obligation To Ensure That The "Operator" Of The Food Services Contract Is A Qualified Blind Vendor . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III. The Court Does Not Possess Authority To Issue Writs Of Mandamus Or Otherwise Directly Award Contracts To A Particular Bidder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

Parcel 49C Ltd. Partnership v. United States,
31 F.3d 1147 (Fed. Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cube Corporation v. United States,
46 Fed. Cl. 368 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Delta Data Sys. Corp. v. Webster,
744 F.2d 197 (D.C. Cir.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

DeMat Air, Inc. v. United States,
2 Cl.Ct. 197 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Input/Output Tech., Inc. v. United States,
44 Fed. Cl. 65 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Lockheed Missiles & Space Co. v. Bentsen,
4 F.3d 955 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Loral Terracom, Marconi Italiana,
B-224908, 87-1 CPD ¶ 1987 WL 96905 (Comp.Gen.1987) . . . . . . 11

ManTech Telecomminc. & Info. Sys. Corp. v. United States.,
49 Fed. Cl. 57 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12, 17

Mississippi Dep't of Rehab. Services v. United States Dep't of Defense,
62 Fed. Reg. 40509 (Jul. 29, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 8

TRW, Inc. v. Widnall,
98 F.3d 1325 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Tech Systems, Inc. v. United States,
50 Fed. Cl. 216 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Widnall v. B3H Corp.,
75 F.3d 1577 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**STATUTES, RULES AND REGULATIONS**

32 C.F.R. § 260.4(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

34 C.F.R. § 395.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

48 C.F.R. § 15.101-2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

48 C.F.R. § 15.404-1(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| BROWN & PIPKINS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-732 |
| | ) | |
| THE UNITED STATES, | ) | (Judge Baskir) |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Pursuant to Rules 56.1 and 7.1(e) of the Rules of the United States Court of Federal Claims ("RCFC") and the Court's November 1, 2006 order, defendant, the United States, respectfully replies to Brown & Pipkins's ("B&P") December 29, 2006 response to its motion for judgment upon the administrative record.

## ARGUMENT

### I. The Contracting Officer Correctly Evaluated The Proposals Pursuant To The "Lowest Cost Technically Acceptable" Criteria

B&P argues that the Army's application of the Randolph-Sheppard Act preference was inappropriate because the Army failed to first establish a competitive range. Pl. Br. at 10. B&P further argues that the Army

violated DOD Directive 1125.3 by entering into direct negotiations with the SLA before establishing a competitive range. Pl. Br. at 7-8.

B&P's argument fails for several reasons. First, it overlooks the fact that the Army applied the "lowest price technically acceptable" procedure for the source selection process. AR987. In such a process, the award is made on the basis of the lowest evaluated price of proposals meeting the standards for technical acceptability and no competitive range is established. 48 C.F.R. § 15.101-2(a). Second, B&P's mechanistic interpretation of the procurement regulations ignores the clear language of the solicitation authorizing the contracting officer to enter into direct negotiations with the SLA if he or she finds the SLA's offer to be technically acceptable. A2. Finally, B&P's argument fails because it relies upon the unsupported proposition that the price differential between the offers of B&P and the SLA is per se unreasonable.

### A. Terms Of Solicitation Did Not Require The Contracting Officer To Establish A Competitive Range

B&P argues that the Army, by its own admission, failed to first establish a competitive range before applying the Randolph-Sheppard Act's mandatory preference. Pl. Br. at 10. In support of its argument, B&P

relies upon statements made by the contracting officer that "no competitive range was established." Id. (quoting AR987, 919).

B&P's argument is without merit because the Army's source selection procedure, and, indeed, the terms of the solicitation itself, did not require the contracting officer to establish a competitive range. Moreover, the solicitation clearly provided that the Army would enter into direct negotiations with any SLA whose offer was determined to be technically acceptable, without further consideration of other technically acceptable offerors. A2. Because the contracting officer precisely followed the process set forth in the solicitation and fully explained her actions, the Court should uphold the award to the SLA.

Section M.1.1 of the solicitation stated that "[t]he Government anticipates the award of a single contract to the offeror whose proposal is evaluated as technically acceptable with the lowest evaluated cost; however priority and mandatory preference will be given [to the] SLA offeror whose proposal is considered technically acceptable and price is determined to be reasonable." A48 (emphasis added). In the "lowest cost/technically acceptable" evaluation process, the award is made on the basis of the lowest evaluated price of proposals meeting the standards for

technical acceptability and no competitive range is established. 48 C.F.R. § 15.101-2(a). The Source Selection Plan more fully explains the Army's evaluation process. As set forth in the Source Selection Plan, the evaluation team would first evaluate each proposal for technical acceptability without consideration of cost. A75. Technical acceptability would be determined on a "pass/fail" basis and proposals would not be ranked or scored. Id. After determining technical acceptability, the Army would evaluate each technically acceptable proposal for "cost realism" pursuant to 48 C.F.R. 15.404-1(d). Therefore, once the Army determined which proposals were technically acceptable, it would award the contract to the offeror with the lowest-priced proposal and would not establish a competitive range or otherwise perform a tradeoff between proposals on the basis of cost or technically acceptability. See 48 C.F.R. § 15.101-2(b)(2) (stating that tradeoffs are not permitted).

Here, the solicitation clearly provided that the agency would apply the Randolph-Sheppard Act's mandatory preference after making the determination of technical acceptability and after evaluating each proposal for "cost realism." A48. The solicitation explicitly stated that the procurement was subject to the Randolph-Sheppard Act and that the Army

would enter into direct negotiations with a technically acceptable SLA "without further consideration of other technically acceptable offerors." A2.

The contracting officer precisely followed this evaluation process. As she explained in the statement of facts accompanying the Army's response to B&P's protest before the GAO, the contracting officer applied the Randolph-Sheppard Act's mandatory preference after evaluating each proposal for technical acceptability and cost realism:

> Once the Technically Acceptability was established then pricing was evaluated. The SLA's proposal and Acsential Services (Brown & Pipkins) proposal were the only ones that were considered technically acceptable. This is the point when cost/pricing was evaluated. This is also the point when the Government considered that the Randolph-Sheppard Act was to take effect.

AR986. Therefore, because the technical acceptability determination narrowed the field to two competitors, and because the mandatory preference for the SLA applied once technical acceptability had been determined, it was reasonable and within the contracting officer's discretion to award the contract to the SLA.

### B. The Contracting Officer Properly Evaluated Pricing When It Determined That The SLA's Proposed Price Was Reasonable

B&P's argument that the contracting officer failed to properly evaluate the pricing of the competing proposals ignores the unchallenged fact that the contracting officer did evaluate the cost of each proposal.

The contracting officer conducted a 'cost realism' analysis of both technically acceptable proposals pursuant to 48 C.F.R. § 15.404-1(d)(2). A48; 901-04. She then compared the SLA's proposed cost to the independent Government cost estimate, B&P's proposed cost, and the incumbent's total estimated contract cost. Although the SLA's proposed cost was higher than that of B&P's, the contracting officer found it to be lower than the independent Government cost estimate, and only two percent higher than the incumbent's total estimated contract cost. Based upon this analysis, the contracting officer found the SLA's price to be reasonable and realistic. AR918 - 19. The contracting officer's evaluation of the SLA's price was reasonable, consistent with the terms of the solicitation, and well-within her discretion. See Tech Sys., Inc. v. United States, 50 Fed. Cl. 216 (2001) (plaintiff must show more than fact that its

bid was lower than awardee's to establish that contracting officer's analysis was arbitrary or capricious).

### C. The Price Differential Between The Offers Of B&P And The SLA Is Not *Per Se* Unreasonable

Contrary to B&P's assertions, there is no per se rule that a price differential between competing proposals of 15 percent (or greater) is unreasonable. In a best-value negotiated procurement, such as this one, it is well-within the procuring agency's discretion to select a higher-cost proposal if that proposal represents the best value to the Government. In Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959-60 (Fed. Cir. 1993), the Court of Appeals for the Federal Circuit upheld the selection of an awardee's proposal costing 100 percent more than one protester and one-half billion dollars more than the other protestor. This Court and the Federal Circuit have upheld similar awards to higher-cost bidders in cases where the Government demonstrated that the added value of the proposal was worth the higher price. See Widnall v. B3H Corp., 75 F.3d 1577, 1581-82 (Fed. Cir. 1996) (upholding award to 15 percent higher-cost proposal); TRW, Inc. v. Widnall, 98 F.3d 1325, 1327 (Fed. Cir. 1996); also Cube Corporation v. United States, 46 Fed. Cl. 368, 387 (2000) (upholding award to higher-cost proposal).

### 1. Authorities Cited By B&P Do Not Support Conclusion That Price Differential Is Per Se Unreasonable

The authorities upon which B&P relies offer no support for its argument that a 15 percent price differential is per se unreasonable. For example, B&P relies upon a Randolph-Sheppard Act arbitration panel decision, Mississippi Dep't of Rehab. Services v. United States Dep't of Defense, 62 Fed. Reg. 40509-510 (Jul. 29, 1997), for its claim that a price proposal that is over 14 percent higher than other technically acceptable proposals is not within the competitive range. The panel's decision, however, merely stands for the proposition that a contracting agency may permissibly exclude a SLA's proposal from the competitive range based upon cost. It says nothing about the magnitude of any cost differential, nor does it establish any sort of per se rule that a differential of a given magnitude is automatically excluded from the competitive range.

### 2. DOD Policy Statement Could Not Have Been Considered By The Contracting Officer And Is Irrelevant To This Court's Inquiry

B&P further relies upon statements made in an August 2006 Joint Report to Congress for the proposition that a price differential of five percent is sufficient to exclude a SLA's proposal from consideration in full

food services contracts. B&P's reliance upon this report is misplaced, however, because the joint policy statement discussed in the report was published after the contracting officer made her decision to award in this case and there is no indication that it applied to this solicitation.

The Joint Report to Congress, co-authored by the Departments of Defense and Education and the Committee for Purchase From People Who Are Blind or Severely Disabled, is dated August 29, 2006, and was signed on September 1, 2006. See Pl. Br. at Ex. B, p. 2. The contracting officer made her decision to award the contract to the SLA on July 25, 2006. The administrative record contains no mention of the August 2006 DOD policy and there is no indication that the policy played any role in the contracting officer's decision. Therefore, it is irrelevant to this Court's analysis of the reasonableness of the contracting officer's decision to award the contract to the SLA. Similarly, B&P's assertion that the DOD policy is now being applied to other DOD food services contracts is not relevant, and it is not properly within the administrative record of this case. Pl. Br. at 13.

## II. The Contracting Officer Properly Found The SLA's Bid To Comply With The Terms Of The Solicitation

### A. Concept Of "Responsiveness" Is Not Applicable To Negotiated Procurements

B&P's argues that the SLA's offer should have been excluded from competition because certain alleged defects rendered it "non-responsive." Pl. Br. at 19. B&P argument rests upon the faulty premise that non-responsive offers automatically should be excluded from negotiated procurements. It is settled that "the sealed bid concept of 'responsiveness' generally does not apply to negotiated procurements." ManTech Telecommunications and Information Systems Corp. v. United States., 49 Fed. Cl. 57, 79 (2001) (quoting Input/Output Tech., Inc. v. United States, 44 Fed. Cl. 65, 69 n. 5 (1999)); see also DeMat Air, Inc. v. United States, 2 Cl.Ct. 197, 202 (1983); Loral Terracom; Marconi Italiana, B-224908, B224908.2, 87-1 CPD ¶ 182, at 8, 1987 WL 96905 (Comp.Gen.1987) ("[T]he concept of responsiveness ··· generally does not apply to the give-and-take of negotiated procurements."). In a negotiated procurement, the Government possesses the discretion to bring an offeror's proposal into conformity with the Government's needs, while preserving fair

competition among all offerors, rather than automatically excluding the offeror from the competition. ManTech, 49 Fed. Cl. at 79.

### B. The Contracting Officer Acted Within Her Discretion When Communicating With The SLA To Clarify Its Proposal

Here, the contracting officer communicated with both B&P and the SLA to clarify certain aspects of their offers. With respect to B&P, the Army found that B&P "did not prepare budgetary data for the entire performance period of this effort." AR902. With respect to the SLA, the Army found that the "total proposed amount is an item that must be discussed with the [SLA]." AR904. In each instance, the Army exercised its discretion and gave the offerors an opportunity to clarify their proposals. In B&P's case, the Army independently verified the general and administrative expenses by relying upon a DAA audit report. AR902. In the SLA's case, the Army communicated with the SLA to "clarify issues that were found in the cost/pricing that was submitted." AR958. These clarifications were necessary to perform the required 'cost realism' analysis and did not result in any change to the terms of either proposal.

In negotiated procurements such as this one, such clarifications are wholly within the discretion of the contracting officer. ManTech, 49 Fed. Cl. at 79. Moreover, the discretion to exclude proposals for informational

deficiencies (as B&P advocates here) is reduced when doing so would reduce the competitive range to only one proposal. Falcon Sys., Inc., Comp. Gen. Dec. B-213661, 84-1 CPD ¶ 658 (it is "incumbent upon an agency . . . to keep an informationally deficient proposal in the competitive range unless further discussions . . would be truly meaningless."). Because the contracting officer possessed the discretion to seek clarification of each offeror's proposals, and because she was not required to eliminate "non-responsive" proposals from this negotiated procurement, B&P's argument that the SLA's proposal should have been excluded is without merit.

### B. Army Complied With Regulations Requiring It To Ensure That It Contracted With State-Licensed Blind Vendors

#### 1. Army Regulation 210-25 Does Not Establish An Independent Duty To Evaluate Whether The SLA's Proposal Complies With The Randolph-Sheppard Act

B&P argues that the Army possessed an independent duty to "evaluate whether the SLA's proposal is in accordance with the Randolph-Sheppard Act" and that the Army should have concluded, based upon the SLA's proposal, that the SLA-nominated contractor was not qualified to be an "operator" as that term is defined in the Randolph-Sheppard Act. Pl. Br. at 15-17. B&P's argument is without merit. The Army's regulations do not establish an independent duty to second-guess the SLA's licensing of blind

vendors or its determination that a given blind vendor is an "operator" within the meaning of the Randolph-Sheppard Act. Moreover, B&P draws unwarranted conclusions from the administrative record when it asserts that "the Army determined the work was not being performed by the blind vendor." Pl. Br. at 16-17.

Under Army and DOD regulations, the Army is responsible for ensuring that "operators are in fact State-licensed blind persons and that sighted employees and assistants are utilized only to the extent reasonably necessary." Army Regulation 210-25(4)(c)4); 32 C.F.R. § 260.4(c)(4). This regulation is intended to ensure that Army contracting authorities give preference only to blind vendors that have been licensed by the appropriate state licensing agency. That is precisely what the Army did in this case when it accepted and evaluated the proposal from the SLA. The regulations say nothing about any obligation to evaluate the qualifications of any vendor nominated by the SLA, nor do they require (or even mention) an obligation to examine whether a SLA's partnering arrangement meets the requirements of the Randolph-Sheppard Act.

B&P asserts, without support or justification, that the Army "determined the work was not being performed by the blind vendor." Pl. Br.

at 16-17. The Army did discuss, in the context of whether the SLA's proposal met certain technical requirements for accounting systems, that Blackstone Consulting, Inc. would be the contractor performing the services provided by the SLA and that its accounting systems were acceptable. AR916. The Army's statement merely acknowledged that the blind vendor nominated by the SLA, Frank Hulsey, had engaged Blackstone Consulting as a teaming partner. Such partnering arrangements are commonplace among Randolph-Sheppard Act vendors. Nothing in the Army's statement, nor in the administrative record, suggests that the Army ever "determined" that Frank Hulsey was not qualified as a blind vendor pursuant to the Georgia state licensing program. Moreover, contrary to B&P's assertions, the organizational chart included in the SLA's proposal shows Frank Hulsey is at the top of the chart and that all employees are subordinate to him, and, therefore, under his operational control. AR100.

Therefore, the contracting officer acted in accordance with Army regulations when she accepted the SLA's proposal for consideration.

### 2. The Army Contracting Agency's Randolph-Sheppard Act Policy Does Not Discuss Any Obligation To Ensure That The "Operator" Of The Food Services Contract Is A Qualified Blind Vendor

The Army Contracting Agency's policy for the implementation of the Randolph-Sheppard Act is notably silent on any duty to determine whether a given SLA's proposal meets the Randolph-Sheppard Act licensing requirements. Army Contracting Agency Policy Memorandum P006, Application of Army Regulation 210-25, dated December 28, 2004 (attached as Exhibit 1). The policy principally addresses the issue of whether a given dining hall contract is subject to a Randolph-Sheppard Act preference. It does not discuss – much less require – the contracting officer to ascertain whether a given SLA-nominated contractor is qualified to be an "operator" as that term is defined in the Randolph-Sheppard Act. The omission is obviously intentional -- the Army is not (and should not) be in the business of determining whether a given blind vendor or partnering agreement meets the requirements of the Randolph-Sheppard Act.

The duty to "evaluate whether the SLA's proposal is in accordance with the Randolph-Sheppard Act," Pl. Br. at 16, lies solely with the SLA, not with the contracting agency. The Department of Education's Randolph-Sheppard Act regulations set forth the obligations of state licensing

agencies to control the issuance and conditions of licenses for blind vendors. That regulation provides that:

> a) The State licensing agency shall establish in writing and maintain objective criteria for licensing qualified applicants, including a provision for giving preference to blind persons who are in need of employment. Such criteria shall also include provisions to assure that licenses will be issued only to persons who are determined by the State licensing agency to be:
>
> 1) Blind;
> 2) Citizens of the United States; and
> 3) Certified by the State vocational rehabilitation agency as qualified to operate a vending facility.

34 C.F.R. § 395.7.

The obligation to ensure that a given vendor or partnering arrangement complies with the Randolph-Sheppard Act, therefore, lies solely with the state licensing agency, not with the contracting authority. As a consequence, the contracting officer acted reasonably when she accepted the SLA's proposed vendor as a qualified licensee pursuant to the Randolph-Sheppard Act.

## III. The Court Does Not Possess Authority To Issue Writs Of Mandamus Or Otherwise Directly Award Contracts To A Particular Bidder

It well-established that the Court does not possess authority to direct an agency to award a contract to a particular bidder in an negotiated procurement, particularly when alternative forms of relief exist. ManTech Telecomminc. & Info. Sys. Corp. v. United States., 49 Fed. Cl. 57, 79-80 (2001). As the Court of Appeals for the District of Columbia Circuit explained in Scanwell Labs., Inc. v. Shaffer, contracting decisions are executive-branch decisions that are left to the discretion of a Government agency. "It is indisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties." 424 F.2d 859, 869 (D.C. Cir.1970).

Here, because the Court could simply direct the agency to re-solicit the contract, it would be inappropriate to direct the award to B&P. See Delta Data Sys. Corp. v. Webster, 744 F.2d 197, 204 (D.C. Cir.1984) (refusing to direct award in negotiated procurement where only one offeror remained and noting that the agency had alternatives rather than awarding to remaining offeror under the original solicitation). Cf. Parcel 49C Ltd. Partnership v. United States, 31 F.3d 1147, 1153 (Fed. Cir.1994)

(injunctive relief proper where it restored the status quo ante and did not direct award to particular contractor).

## CONCLUSION

For these reasons, the defendant respectfully requests that the Court grant the Government's motion for judgment upon the administrative record and deny B&P's motion.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Patricia M. McCarthy
PATRICIA M. McCARTHY
Assistant Director

s/ Kenneth D. Woodrow
KENNETH D. WOODROW
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, NW
Washington, DC 20530
Phone: (202) 353-0513
Fax: (202) 514-7976

OF COUNSEL:

CHRISTOPHER L. KRAFCHEK
CPT, JA
Contract & Fiscal Law Division
Trial Attorney, Team III
901 N. Stuart Street, Suite 500
Arlington, VA 22203
Phone: 703-696-2804
Fax: 703-696-1535

January 10, 2007

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 10th day of January 2007, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Kenneth D. Woodrow

# EXHIBIT 1

DEPARTMENT OF THE ARMY
OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY
ACQUISITION LOGISTICS AND TECHNOLOGY
U.S ARMY CONTRACTING AGENCY
5109 LEESBURG PIKE SUITE 302
FALLS CHURCH VA 22041-3201

DEC 2 8 2004

SFCA-CP

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Army Contracting Agency Policy Memorandum P006: Application of Army Regulation (AR) 210-25, Vendor Facility Program for the Blind on Federal Property - Randolph-Sheppard Act (R-S Act)

This policy memorandum applies to solicitation and award of Army Contracting Agency (ACA) contracts using the requirements of AR 210-25, Vending Facility Program for the Blind on Federal Property-Randolph-Shepard Act (20 U.S.C. 107). AR 210-25 was revised on June 14, 2004. Changes were accomplished to this revision on June 30, 2004.

The Enclosure provides an overview of the Act and preferences and procedures to be followed when acquiring vendor services to handle or participate in the preparation of food, the ordering of food/supplies, or the overall management of a dining facility.

If you have any questions regarding this matter, please contact, Chris Thompson at commercial (703) 681-6700, DSN 761-6700 e-mail Christine.Thompson@us.army.mil or Godfrey Smith at commercial (703) 681-1054, DSN 761-1054 e-mail Godfrey.Smith@us.army.mil

Sandra O. Sieber

Sandra O. Sieber
Head of Contracting Agency
Army Contracting Agency

Enclosure

DISTRIBUTION:
U.S. ARMY CONTRACTING AGENCY PRINCIPAL ASSISTANTS RESPONSIBLE FOR CONTRACTING
U.S. Army Contracting Agency, Southern Region, ATTN: SFCA-SR, 1301 Anderson Way, SW., Fort McPherson, GA 30330-1096
U.S. Army Contracting Agency, Northern Region, ATTN: SFCA-NR, 11 Bernard Road, Building 10, Fort Monroe, VA 23651-1001
U.S. Army Contracting Agency, Information Technology, E-Commerce and Commercial Contracting Center (ITEC4), ATTN: SFCA-IT, 2461 Eisenhower Avenue, Hoffman Building 1, Alexandria, VA 22331-1700
U.S. Army Contracting Command, Europe, ATTN: SFCA-EC, Unit 29331, APO AE 09266
U.S. Army Contracting Command, Korea, ATTN: SFCA-KC, Unit 15289, APO AP 96205-5289
U.S. Army Contracting Element, Pacific, ATTN: SFCA-PR, 140 Doleman Street, Building T115, Fort Shafter, HI 96858-5430
U.S. Army Contracting Agency, The Americas, ATTN: SFCA-SH, 2450 Stanley Road, Suite 320, Fort Sam Houston, TX 78234-7515
U.S. Army Contracting Command/PARC, Southwest Asia, ATTN: SFCA-SA, 1881 Hardee Avenue, S.W., Fort McPherson, GA 30330-1064

**Army Contracting Agency**
**Randolph-Sheppard Act Policy**

**1. Randolph-Sheppard Act (RSA) Overview.**

The RSA is a Federal law that establishes a preference in favor of firms, operated by blind persons, for various vending services on Federal installations operated by executive branch agencies. Originally enacted in 1936, the RSA "provides blind persons with remunerative employment, enlarges the economic opportunities of the blind, and stimulates the blind to greater efforts in striving to make themselves self-supporting." The law is published in Title 10 of the U.S. Code, Secs. 107-107e. A 1974 amendment applied the RSA to "cafeterias."

**2. RSA Implementation.**

Military dining facilities are covered by the RSA. The RSA designates the Department of Education (DE) as the proponent for publishing regulations and administratively resolving issues and disputes among other agencies concerning the RSA. The DE has published RSA regulations in Sec. 395 of Title 34 of the Code of Federal Regulations (CFR). The DE has statutory authority to finally decide certain RSA disputes, and may do so through mandatory arbitration. DoD guidance is published in DODD 1125.3, Vending Facility Program for the Blind on Federal Property, 22 August 1991. Army guidance is published in AR 210-25, Vending Facility Program for the Blind on Federal Property, 30 June 2004.

**3. RSA Preference Applicability.**

The RSA preference covers only dining facility (DF) "operation." Not every function within or related to a DF, that may be acquired through a commercial contract, is subject to the RSA preference. A contract that simply engages a firm to come in once per month to buff and wax the floors, or once a year to paint the walls, is not subject to the RSA. Likewise, table bussing/clean-up and dishwashing services (otherwise known as "dining facility attendant" (DFA) services) may be procured using normal contracting procedures in a separate contract action. As a general rule, contracts calling for the vendor to handle or participate in the preparation of food, the ordering of food/supplies, or the overall management of the DF will be subject to the RSA (otherwise known as "full food services" (FFS)).

By a memorandum dated 20 November 2001, the Acting Assistant Secretary of the Army (Acquisition, Logistics & Technology) (ASAALT) directed that RSA coverage be determined by the "predominant character of the procurement." Under this approach, DF procurements were to be analyzed to derive the percentages of each requirement attributable to FFS versus DFA or other services. Thus, if the FFS component was deemed to constitute less than 50% of the total DF requirement, the RSA preference would not apply; conversely, if FFS equaled or exceeded 50% of the requirement, the RSA preference would apply. This method of determining RSA applicability is no longer considered to be legally sufficient.

Instead, if a contract will contain an FFS element, it should be presumed to be subject to the RSA preference. If there is any doubt as to whether the RSA applies to a specific procurement, the contracting officer after consulting with local legal counsel, should consult, through contracting channels, with contracting officer's regional PARC headquarters Operations/Policy Directorate. In the alternative, if the FFS and non-FFS elements of a requirement are discrete

and readily segregable, there is no objection to conducting separate procurements. In such a case, only the FFS element would be subject to the RSA preference.

**4. RSA Procurements.**

**<u>Statutory Preference</u>**

The RSA requires that, "[The DE] ... establish a priority for the operation of cafeterias on Federal property by blind licensees when [the DE] determines, on an individual basis and after consultation with the head of the appropriate installation, that such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided to employees, whether by contract or otherwise."

**<u>State Licensing Agency</u>**

Each state government has an organization, known as a "state licensing agency" (SLA) that is designated by the DE Commissioner of the Rehabilitation Services Administration to issue licenses to blind persons for the operation of vending facilities on Federal property. The SLA represents the blind vendor in procurement competitions. Regardless of the size of the blind vendor's business, the SLA is considered to be other than a small business for purposes of applying Small Business Act requirements. 13 C.F.R. § 121.105(a).

**<u>Procedures</u>**

-- If the RSA preference applies to an appropriated fund procurement, use normal contracting procedures, with the following exceptions:

-- <u>Solicitation and Competitive Range Determination</u>.

* The SLA will be invited to submit a proposal.

* If the SLA proposal does not have sufficient merit to warrant inclusion within the competitive range, the decision to exclude the SLA from the competitive range will be made by the regional PARC (without power of redelegation). Because of the likelihood that a competitive range exclusion will lead to DE arbitration, PARCs will notify the ACA Headquarters Operations Directorate within three working days of deciding to exclude an SLA from the competitive range in an RSA-covered procurement.

* If the SLA is included in the competitive range, award will be made to the SLA unless: (1) the on-site official determines that award would adversely affect the interests of the United States, or that the blind vendor does not have the capacity to perform the contract; and (2) the DE Secretary approves. AR 215-25, para. 6b(1)(c).

-- <u>Award Without Discussions</u>. An award without discussions in a procurement subject to the RSA preference may be made:

* if the solicitation includes notice that award may be made without discussions;

* if after evaluation of proposals, award without discussions is deemed appropriate;

* if award without discussions would be to an offeror other than the SLA; and

* if the regional PARC (without power of redelegation) approves the decision to award without discussions.

The rationale for any decision to award without discussions must be clearly articulated in writing at the time of decision. Because of the likelihood that award without discussions under these circumstances will lead to DE arbitration, PARCs will notify the ACA Headquarters Operations Directorate within three working days of deciding to award without discussions to other than the SLA.

-- Direct Negotiations. In RSA-covered procurements, when the SLA is capable of providing the required services at a reasonable cost, with food of high quality comparable to that available from other food services providers, the government may elect to enter into direct negotiations with the SLA. AR 210-25, paragraph 6c(2) commits the decision to conduct direct negotiations to the "on-site official," which is typically the garrison commander. Although the decision is not the contracting officer's, direct negotiations are rarely warranted in the government's business interest. Contracting officers should normally advise on-site officials against direct negotiations. If the contracting officer believes that direct negotiations are clearly in the government's interest, the contracting officer may so advise the onsite official, but only after notifying the ACA Headquarters Operations Directorate, through contracting channels.

**5. RSA Preference Interaction With Other Preference Programs.**

When two or more statutory preferences apply to a particular procurement, the more specific preference takes precedence over one that is general in nature. The RSA establishes a very specific and narrowly focused preference because it is targeted at cafeteria and vending operations; thus, the RSA preference most often takes precedence. However, the array of preference programs and the order of precedence among them are complex and variable. Contracting officers should therefore consult with legal and small business specialists early in the acquisition cycle for FFS requirements to determine which socio-economic programs pertain to their procurements.