# In the United States Court of Federal Claims

Case No. 06-732C
(Filed: January 29, 2007)
NOT FOR PUBLICATION

*********************************************
BROWN & PIPKINS, LLC, *
doing business as Acsential Services, *
*Plaintiff*, *
*
v. *
*
THE UNITED STATES OF AMERICA, *
*Defendant*, *
*
*********************************************

***S. Gregory Joy***, *Smith, Currie & Hancock, LLP, Atlanta, GA, for the Plaintiff. With him on the briefs was* ***James W. Copeland***.

***Kenneth D. Woodrow***, *Commercial Litigation Branch, Department of Justice, Washington, D.C., for the Defendant. With him on the briefs were* ***Peter D. Keisler***, *Assistant Attorney General,* ***David M. Cohen***, *and* ***Patricia M. McCarthy***, *Assistant Director.* ***Captain Christopher L. Krafcheck***, *United States Army, Of counsel.*

***John M. Bergen***, *Law Clerk*.

## ORDER/OPINION

**BASKIR, Judge.**

This is a bid protest challenging a United States Army procurement decision to award a contract for cafeteria services at Fort Gordon, Georgia, to a certified blind vendor pursuant to the Randolph-Sheppard Act, 20 U.S.C. § 107 (RSA). The Plaintiff seeks a permanent injunction. The parties entered into an arrangement obviating the need for a temporary restraining order. The parties have filed cross-motions for judgment on the administrative record.

After considering the papers submitted by the parties and after hearing oral argument on the motions, the Court issued a bench ruling granting the Government's motion and denying the Plaintiff's motion. This Order/Opinion memorializes that ruling.

To the extent there are any inconsistencies between this Order/Opinion and the rulings announced at the hearing, these findings and conclusions shall control.

## BACKGROUND

### A. <u>The Solicitation and its Requirements</u>:

The solicitation at the root of this protest, Solicitation No. W911SE-05-R--0013, was issued on February 22, 2006, by the Army Contracting Agency at Fort McPherson, Georgia. The solicitation called for vendors capable of performing full food services – ordering supplies, food preparation, and overall management of dining facilities – at Fort Gordon, an Army installation located near Augusta, Georgia.

The proposals were to be evaluated on two factors: technical acceptability and cost. Solicitation, ¶ M.3.1. However, the evaluation procedure employed is a staged process whereby only those proposals considered technically acceptable are submitted for further evaluation. *Id.* At that point, the contracting officer considers those proposals for cost/price realism and for completeness of the offerors' projected costs. Solicitation, ¶ M.3.2. This last step is an extremely limited assessment. *See* Solicitation, Source Selection Plan at ¶10 (b) ("Cost realism will not be scored but will be used as to determine whether proposed cost estimates are realistic for the work to be performed and thus, reflect a clear understanding of the requirements of the PWS."); Administrative Record (AR) 76.

Unlike other best-value acquisitions, the procurement strategy chosen here involves simply selection of the lowest cost of those that are technically acceptable. There are no cost-performance trade-offs, nor does it allow ranking or scoring of proposals. Under section 15.101-2 of the Federal Acquisition Regulation (FAR), 48 C.F.R. 15.101-2, the lowest price technically acceptable proposal will necessarily be entitled to award of the contract, absent any intervening mandatory preferences. This aspect of the procurement is critical to the protest and its resolution.

This competitive procurement was subject to two such statutory priority schemes: one for certified small business concerns under Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a); and one for blind vendors qualified by the appropriate state licensing agency (SLA), under the Randolph-Sheppard Act, 20 U.S.C. § 107. The Federal Acquisition Regulation addresses the former, *see* 48 C.F.R. § 52.219-18, but provides no specific guidelines for procurement officials in applying the RSA. The application of the blind vendor priority is governed not by procurement regulations, but by Department of Defense (DoD) policy and regulations. We address those regulations in more detail in the Discussion, below.

The solicitation, itself, sets forth the Army's application of the RSA in this particular procurement. There has been no formal objection to the solicitation, nor is there any suggestion by Plaintiff that the solicitation contravenes the DoD policy regarding the RSA. Brown & Pipkins contends that the RFP is not defective, but simply incomplete, in the sense that it did not spell out the RSA regulations incorporated.

The Army's Source Selection Plan clearly sets forth the RSA preference in the section entitled "Basis for Award." That section also demonstrates that once it is determined that a qualifying SLA has submitted a reasonable proposal, this procurement will be awarded to the SLA. The provisions read as follows:

> The government anticipates the award of a single contract to the offeror whose proposal is evaluated as technically acceptable with the lowest evaluated cost; however, priority and mandatory preference will be given SLA offeror whose proposal is considered technically acceptable and price is determined to be reasonable.
>
> In accordance with FAR provision 52.215-1, Instructions to Offerors – Competitive Acquisitions, the Government reserves the right to evaluate proposals and *award a contract without discussions based solely upon initial offers and without providing the opportunity to offerors to submit revised proposals*; therefore, each initial offer must contain the offeror's best terms from a technical and cost standpoint.

Solicitation, Source Selection Plan, ¶ 11 at AR 76 (emphasis added); *see also,* Solicitation, Section M (Evaluation Factors for Award) at ¶ M.1.

The solicitation also warned at the outset that non-SLA contractors would likely face competition from an offeror entitled to the priority. In a section captioned "NOTICE OF APPLICABILITY OF RANDOLPH-SHEPPARD ACT," the Army stated:

> All offerors are hereby put on notice that this solicitation is subject to the exercise of certain Defense preference policies regarding the Randolph-Sheppard Act ... Present DoD and Army policy, interpreting the Randolph-Sheppard Act applies a selection preference to qualified nominees of State Licensing Agencies (SLA) for the Blind who represent clients seeking Defense contracts for so-called "military cafeteria-style food operations."
>
> *Application of this preference may entitle a qualified offeror, whose evaluated proposal is determined technically acceptable to enter into direct negotiations with the Government without further consideration of other technically acceptable proposals*.
>
> This notice is not designed to discourage competition from any 8(a) offerors interested in this requirement. Rather, it merely represents notice regarding a mandatory preference for Randolph-Sheppard Act State Licensing Agencies in the event that an offer from such a source is received ...
>
> NOTE: THE GEORGIA SLA HAS EXPRESSED INTEREST IN THIS REQUIREMENT.

Solicitation at 2 (emphasis added).

**B. <u>The Procurement Selection Process</u>**:

The Army received five responses to its RFP. After evaluating each for their technical merit, the Army considered only two proposals "technically acceptable": the proposal submitted by Brown & Pipkins and the proposal submitted by the blind vendor in the name of the SLA, the Georgia Department of Labor Business Enterprise Program. The contracting officer noted points of clarification which would be required by each of the offerors, but found that the proposals demonstrated the ability to successfully perform the requirements of the contract. *See* Post-Negotiation Memorandum at AR 916.

The cost realism reviews for each proposal resulted in a report designated as the Price/Cost Analysis Report of Findings. Among the items considered are the accounting systems for each offeror. With respect to the SLA, the Army noted an audit that had been conducted to determine the adequacy of the offeror's accounting system, and pointed out that accounting procedures would be performed by someone other than the blind vendor, that is, Blackstone Consulting, Inc (BCI):

> Accounting System – *The actual contractor performing the work is Blackstone Consulting, Inc.*, and the accounting system is operational and has been determined acceptable to support cost-type contracts.

AR 903 (emphasis added); *see also*, Post Negotiation Memorandum (Aug. 8, 2006) at AR 916 (citing Price/Cost Analysis Report and underlying audit). Elsewhere in the administrative record there are organizational charts that purport to allocate contract performance functions between the blind vendor, Franklin Hulsey, and BCI. We shall discuss the emphasized portion set out above and the charts further in the Discussion section.

At this point, however, consideration of Plaintiff's proposal ceased. The Army did not actively engage the Plaintiff in discussions or clarifications. In the Post-Negotiation Memorandum, which was approved on August 8, 2006, the contracting officer's technical assessment of the Brown & Pipkins proposal is followed by the following note:

> As priority and mandatory preference is given SLA offeror whose proposal is considered technically acceptable and price is determined to be reasonable, the cost proposal of Brown & Pipkins is not discussed herein.

*Id.* According to the contracting officer, the "direct negotiations" clause emphasized in the solicitation had become operative in this source selection process. We note that the term "negotiations" probably overstates what transpired between the SLA and the contracting officer. According to the documents made available to us, the Army merely sought "clarifications" of various aspects of its proposal. *See id.* at 916-918. What is important for purposes of this case is that the contracting officer determined that she would consider only the SLA bid at that point in the source selection process.

Pursuant to the RFP and the Source Selection Plan, the SLA bid, having been deemed technically acceptable and survived the cost/price realism review, was now evaluated for cost/price reasonableness. Although the SLA bid was between 15-20 percent higher than that of Brown & Pipkins, it was substantially lower than the Independent Government Estimate (IGE) and only slightly above the incumbent contractor's price. The contracting officer found the price reasonable. The record is somewhat inconsistent on the question whether the Brown & Pipkins price was considered during the reasonableness review. The record discloses that it was in two references, Post Negotiation Memorandum, VIII (Source Selection Decision Statement) at ¶¶ (a) and (b) (AR 918), but in another reference, Contracting Officer's Statement of Facts (AR 986), Brown & Pipkins' price is not mentioned as part of the reasonableness evaluation. As we shall see, the bid protest at its core consists of Plaintiff's argument that the SLA premium of 15-20 percent is *per se* unreasonable.

Be that as it may, the contracting officer determined that the SLA bid met the award criteria and awarded the contract on August 17, 2006. Subsequently, on August 24, the Army conducted a debriefing with Brown & Pipkins, in which the contracting officer explained to the company's principals and its attorney the basis for the Army's decision to award the contract to the SLA.

Immediately thereafter, Brown & Pipkins filed a bid protest with the Government Accountability Office (GAO), alleging arguments similar to those raised here. On September 26, 2006, the GAO granted the Army's motion to dismiss the protest. The Comptroller General's Decision upheld the Army's application of the RSA, concluding the mere fact that Plaintiff's cost was lower than that proposed by the SLA did not demonstrate that the SLA's proposal was not fair and reasonable. *Brown & Pipkins, LLC*, B-298713 (Sept. 26, 2006); AR at 1009. It further found that the Army engaged in discussions with the SLA and that "[b]y definition, an offer that is the subject of discussion is within the competitive range." *Id.* We do not necessarily agree with its rationale, but concur with the result reached by the GAO. Brown & Pipkins subsequently filed a bid protest in this Court on October 27, 2006.

## DISCUSSION

### A. Applicable Legal Standards:

Our jurisdiction in this matter is based upon the Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870 (1996). The amendment confers jurisdiction over bid protest cases, defined as an objection by an interested party "to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

The procuring agency's decision is reviewed under those standards set forth in the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A). The scope of review, as defined by the APA, is narrow. *Citizens to Preserve Overton Park, Inc. v. Volpe*,

401 U.S. 402, 416 (1971). We accord the agency deference, only setting aside an action or decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Fru-con Const. Co., Inc. v. United States*, 57 Fed. Cl. 483, 485 (2003). This analysis considers whether: "(1) there was subjective bad faith on the part of procurement officials; (2) there was a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated." *Metric Sys. Corp. v. United States*, 42 Fed. Cl. 306, 310 (1998) (citing *Keno Indus., Inc. v. United States*, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974)).

The U.S. Court of Appeals for the Federal Circuit recently reiterated the standards that apply to bid protests. *See Banknote Corp. of America v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004). In alleging error, the Plaintiff must do more than identify circumstances where the procuring agency made a mistake; it must establish that such a mistake was so excessive as to fall outside the decision-maker's ambit of discretion. In other words, Plaintiff must persuade us "that there was no rational basis for the agency's determinations." *Id.* at 1351 (quoting *Impresa Contstruzioni v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001))*; see also Baird Corp. v. United States*, 1 Cl. Ct. 662, 664 (1983).

Additionally, when challenging the procurement on the basis of a regulatory violation, the protestor "must show a clear and prejudicial violation of [the] applicable statutes and regulations." *Banknote*, 365 F.3d at 1351 (quoting *Impresa*, 238 F.3d at 1333); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000). To establish prejudice on this ground requires the protestor to show that there was a "substantial chance" it would have been awarded the contract absent the alleged violation. *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999). Indeed, the Court of Appeals has directed us to address the prejudice issue first in bid protests, thus elevating the requirement to one of standing. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."). Although the Government did not raise the issue of prejudice, and it was not briefed, as we have noted, at bottom the Plaintiff's claim alleges error based on the excessive price of the SLA's bid. With the resulting disqualification of the SLA bid, if error is found, Brown & Pipkins would have received the award as the lowest bidder, thus satisfying the prejudice requirement.

This case is before us on cross-motions for judgment on the administrative record. The parties invoked RCFC 56.1, which has been abrogated as of June 20, 2006. Under the new Rules adopted by this Court, summary judgment standards are not applicable to motions for judgment on the administrative record. *See* RCFC 52.1 (b); *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005). The facts upon which we rely are found exclusively in the administrative record of the procurement, which include any matters developed and considered by the agency in making its decision. *Aero Corp. v. United States*, 38 Fed. Cl. 408, 410 (1997). The administrative record as proffered by the Government may also be "supplemented" under certain

circumstances, as we discuss shortly when we consider evidence belatedly offered by Brown & Pipkins.

Plaintiff has raised three errors concerning the Army's procurement of food services at Fort Gordon under this solicitation. First, the Plaintiff faults the contracting officer's failure to establish a competitive range or otherwise conduct a comparative analysis of the price of Brown & Pipkins versus the SLA. Second, the Plaintiff asserts that the Army's award to the SLA violates the RSA because it effectively allows the contract to be performed by a vendor which is not blind. And finally, Plaintiff alleges that the SLA's proposal was defective and should not have been considered by the contracting officer because the SLA failed to include certain pricing information. As with any administrative review under the APA, we limit our inquiry to "whether the decision was based on a consideration of the relevant facts and whether there has been a clear error of judgment." *Overton Park,* 401 U.S. at 416 (citations omitted). In this case, we conclude that the Army clearly satisfies this standard.

**B. Competitive Range:**

Brown & Pipkins insists that the contracting officer should have established a competitive range. Due to the excessive price differential between it and the SLA proposal, the Brown & Pipkins proposal alone should have been included in the competitive range.

Under the FAR, the source selection authority establishes a competitive range *if discussions are to be conducted*. FAR 15.306(c). When its use is appropriate, the competitive range is intended to be inclusive in order to foster competition among "all of the most highly rated proposals." *Id.; see Birch & Davis Internat'l, Inc. v. Christopher*, 4 F.3d 970, 974 (Fed. Cir. 1993) ("It is well established that a proposal must generally be considered to be within the competitive range unless it is so technically inferior or out of line as to price, as to render discussions meaningless.")

In its protest the Plaintiff relies not on the Federal Procurement Regulations but rather on the specific reference of "competitive range" in the pertinent DoD regulations implementing the RSA. DoD Directive 1125.3 provides the following guidelines concerning the operation of RSA preference for the SLA:

> If the State licensing agency submits a proposal and it is not within the competitive range established by the contracting officer, award may be made to another offer or following normal procurement procedures, but only after the on-site official confers with the Head of the DoD Component.
>
> If the State licensing agency submits a proposal and it is within the competitive range established by the contracting officer, the contract will be awarded to the State licensing agency except as provided in E2.1.3.1.3., below.

DoD Directive 1125.3 at ¶¶ E2.1.3.1.1 and E2.1.3.1.2.

The exception built in to this process is set out in subparagraph 3, as indicated. That exception permits the contracting officer to award to a contractor other than the SLA when the on-site official, defined in the regulations as the Installation Commander, "determines that award to the State licensing agency would adversely affect the interests of the United States." This exception requires consultation with and approval by the Secretary of Education, the lead agency responsible for implementing the RSA, and the head of the appropriate DoD component, in this case the Secretary of the Army. DoD Directive 1125.3 at ¶ E2.1.3.1.3.

Plaintiff cites these passages for the proposition that the regulations applying the RSA *require* the contracting officer to set a competitive range when determining if the SLA should be afforded priority. The cited provisions require nothing of the sort. Competitive range procedures clearly are not the focus of this directive. Rather these provisions merely set forth the need for high-level approval when a contracting officer decides not to afford priority to an SLA's proposal. At most, the language assumes the establishment of a competitive range. But there is no support for Plaintiff's characterization of the regulatory provisions here. Plaintiff has not offered any procurement language that requires the setting of a competitive range in these circumstances.

We do not deny the importance of price comparison in competitive procurement. Plaintiff cites *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303 (2000), for the proposition that "price must always be a factor in an agency's decision to award a contract." *Id.* at 338 (quoted in Pl. Br. at 22). The block quote from this case continues:

> Moreover, an agency may not discount the importance of price in a price/ technical tradeoff to such an extent that it "effectively renders the price factor meaningless" ... These requirements "mean that an agency may not exclude a technically acceptable proposal from the competitive range without taking into account the relative cost of that proposal to the government."

*Id.* (internal citations omitted). Notably absent from this quotation, as with other citations found in the Plaintiff's brief, is any mention of the FAR provision applicable to this acquisition – FAR 15.101-2, governing the lowest price technically acceptable source selection process.

Pursuant to FAR 15.101-2, there is no "price/technical trade-off." Nor does the solicitation permit the contracting officer to weigh the relative costs of proposals. There is no scoring of technical aspects, nor any ranking of bids. The lowest priced proposal that is determined to be technically acceptable receives the award. In short, the Army has not ignored price, as Plaintiff contends; rather, the Army has made this source selection entirely based on the lowest price technically qualified proposal.

Under those circumstances, we conclude that the establishment of a competitive range makes no sense. In fact, a traditional "competitive range" would conflict with the express provisions of the solicitation, which never used the term, and would unfairly

allow a non-SLA offeror, other than the lowest-priced technically qualified proposal, to remain eligible for contract award.

For example, assume for demonstrative purposes that multiple proposals passed the technical acceptability threshold. Under that scenario, Brown & Pipkins is the leading non-SLA candidate and will necessarily receive the award in the event the RSA priority is not ultimately applied. *See* Source Selection Evaluation Board Summary (4 May 2006) at AR 900 ("Should [the SLA] proposal's price reasonableness be deemed unacceptable the SSEB recommends Brown & Pipkins, LLC.")

Yet under the Plaintiff's approach another higher-priced offeror might be included in the competitive range. The only possible rationale for accepting others into a competitive range is to permit a bidder other than lowest bidder Plaintiff to cast its proposal in a more attractive light during discussions, in order to persuade the Army to trade-off a more expensive proposal for certain performance advantages. But that scenario bears no resemblance to the process envisioned by this Source Selection Plan and FAR 15.101-2. And we are probably safe in assuming that the Plaintiff would be before us with an entirely different bid protest had such a result been allowed.

Later, in the GAO litigation, the contracting officer creates some confusion on this issue by suggesting a *de facto* competitive range:

> Because of this evaluation process that was utilized there was no official competitive range set for this procurement. The proposals submitted by the SLA and Acsential Services (Brown & Pipkins) were the only acceptable proposals, so in essence they were considered the competitive range.

*See* Contracting Officer's Statement of Facts at AR 985. This and other references to an effective competitive range serve only to obscure the real issue. The Government, at oral argument, disavowed these references and based its argument foursquare on FAR 15.101-2, which does not contemplate a competitive range, real or "virtual."

On the record, Brown & Pipkins could not have been misled. The Solicitation clearly set forth a procedure which did not incorporate a competitive range procedure. The post-award debriefing indicates that Plaintiff neither objected to the solicitation nor sent questions or expressed concerns prior to submitting its proposal. Memorandum for Record, Debriefing of Brown & Pipkins (Aug. 24, 2006) at AR 967.

Plaintiff has repeatedly been informed by the procurement officials "of the source selection procedures used and why competitive range was not applicable for the award" of this contract. *Id.; see also*, Source Selection Decision at AR 919 ("Rationale for business judgments and tradeoffs ... Under this process the comparative assessment does not apply. There is no ranking or scoring of proposals; and tradeoffs are not permitted. Best value is derived from he selection of the technically acceptable proposal with the lowest evaluated cost.") (citing FAR 15.101-2, Lowest price technically acceptable source selection process.)

As we have suggested – and as we will address further below – it is not simply the setting of a competitive range that Plaintiff seeks, but a competitive range defined in such a way as to exclude the SLA price premium as disqualifying. In other words, the price differential between the two bids is too great for a rational decision-maker to include both in the same competitive range.

## C. <u>The Limitations on the Randolph-Sheppard Act's Mandatory Preference – Price Reasonableness</u>:

As a corollary to the competitive range argument, Brown & Pipkins asserts that the administrative record does not establish that the contracting officer considered the difference between the SLA's price and Plaintiff's price, in determining whether the cost of the SLA's proposal was reasonable. Instead, the contracting officer only compared the SLA's price to: (1) the Independent Government Cost Estimate (IGE) for this procurement; and to (2) the price at which the incumbent contractor had been performed similar services.

As an initial matter, the record does not support Plaintiff's contention that the contracting officer never considered the bid submitted by Brown & Pipkins in determining the reasonableness of the SLA's offer. We quote the following passage from the administrative record:

> As Source Selection Authority for this acquisition, I have determined that the full food services proposed by GA DOL (the SLA) provides the best overall value to satisfy Army needs. This selection was made based upon the factors and subfactors established in the solicitation and my integrated assessment and comparison of the offeror's technical and cost proposals submitted in response to the solicitation criteria. This memorandum documents the basis for my decision.

Source Selection Decision Statement at AR 918 (The word "offeror's" may have been a typographical error, where "offerors'" was intended.). The documented basis goes on to apply the RSA preference:

> Pursuant to the solicitation's requirement, the IGE of $47,544, 350, *and comparison of other offerors' proposed cost*, the SLA's offer of $40,723,007, which reflects only a 2% increase over the incumbent's total estimated contract cost, is considered reasonable and award is authorized in accordance with the RSA preference established in the solicitation.

*Id.* (emphasis added.)

Next, the contracting officer sets out the SLA price, the Brown & Pipkins price, and the Independent Government Estimate within a chart. AR 919. Although the subparagraph containing the chart designates the list as offerors in the competitive range, it cites Randolph-Sheppard Act policy and contains the explicit disclaimer: "[B]ecause the solicitation indicated that award without discussions was intended and

the Contracting Officer has determined that discussions are not necessary, a competitive range was not established; however, following is a depiction of each technically acceptable offeror's proposed cost." *Id.*

Based on this record, therefore, the contracting officer did compare the bidders' prices when determining the reasonableness of the SLA's cost. Once reasonableness of the SLA's proposal was established, there was no requirement to consider Plaintiff's costs -- neither in a formal competitive range analysis, nor in discussions with Brown & Pipkins, or otherwise. This is reflected in the previously referenced chart. There is an upward adjustment of the SLA's price from "proposed cost" to "most probable cost estimate." AR 919. There is no similar adjustment respecting Plaintiff's proposed cost, probably because the contracting officer did not actively pursue the cost information once she determined that the RSA priority would be afforded the SLA. *Id.*; *accord* Debriefing Notes at AR 968 ("Priority and mandatory preference was given SLA offeror whose proposal was considered technically acceptable and price is determined reasonable; therefore, the cost proposal of Brown & Pipkins is not addressed.").

Plaintiff maintains, despite the evidence to the contrary, that the contracting officer did not consider the difference in price when deciding whether the SLA's price was reasonable. Failing that, Plaintiff contends that no comparative analysis could rationally result in a finding that the SLA's price, which was over $6 million, or as much as 19 percent more expensive than that of Brown & Pipkins, was "reasonable."

We find nonetheless that the contracting officer acted in accordance with the procedures set forth in Section M of the Solicitation. The contracting officer formally acknowledged the Army's obligation under the RSA to award the contract "to the offeror whose proposal is evaluated as technically acceptable with priority and mandatory preference given the SLA offeror whose proposal is considered technically acceptable and price is determined reasonable." *See* Source Selection Decision, ¶ VIII (c) (AR 918).

Assuming *arguendo* that the contracting officer evaluated the reasonableness of the SLA's price independent of the other proposals, we still find no error. The Plaintiff has pointed us to no authority which would require assessment of a SLA-low bidder differential in determining whether the SLA's price is fair and reasonable. Nor has Plaintiff established that comparison with the incumbent's price, or with the IGE, or both, is an abuse of discretion. Indeed Plaintiff has not successfully argued that a difference in price of 16 percent – or under Plaintiff's worst-case scenario, 19 percent – is *per se* unreasonable. Under the circumstances, therefore, we find the contracting officer was not compelled to make a comparison between Plaintiff's price and that of the SLA.

Plaintiff has not met its burden of proving "that there was no rational basis for the agency's determinations." *Banknote Corp.*, 365 F.3d at 1351 (quoting *Impresa*, 238 F.3d at 1332-33). The contracting officer provides reasonable explanations for her findings, which are supported by the administrative record and are not rebutted by other evidence. This satisfies the rational basis test. The contracting officer recognized that the SLA offer was not the lowest offer received, but determined under the RSA that the

offer was nevertheless reasonable. The basis for the determination is adequately documented in the Source Selection Decision Statement, AR 918-919, and elsewhere in the administrative record.

The Plaintiff has not challenged the IGE, nor has it made any argument that the price of $41.7 million, in and of itself, is an unreasonable cost for the services provided. Nowhere in Plaintiff's papers is there the suggestion that the contracting officer's reliance on the IGE, and on the incumbent's price, as factors in determining reasonableness, was arbitrary and capricious.

According to an affidavit attached to Plaintiff's reply brief, a solicitation for food services at Andrews Air Force Base (AFB), Maryland, was amended very recently to reflect that:

> [t]he SLA will receive award if their final proposal revision does not exceed the offer that represents the best value ... by more than five percent of that offer or one million dollars, whichever is less, over all periods required by the solicitation.

Affidavit of Deidre F. Brown (Dec. 29, 2006), Pl. Reply at Ex. A; *see also*, Amendment of Solicitation/ Modification of Contract (Dec. 8, 2006), Pl. Reply at Ex. A-1.

This material is completely irrelevant to the present award decision. The proffered evidence relates to an entirely separate procurement involving a different military department, a different facility, in a different state, and during an entirely different period of time. The amended RSA provisions of this Air Force solicitation went into effect four months after the Army's award to the SLA in this case.

Plaintiff's exhibit concerning new RSA policy is rejected for the same reasons. The document attached as Exhibit B to Plaintiff's reply brief is a report to Congress, signed by representatives of the Departments of Defense and Education, as well as the Committee for Purchase From People Who Are Blind or Severely Disabled. The policy statement includes a number of new initiatives but Plaintiff cites only to a portion entitled "Method of Affording the Randolph-Sheppard 'Priority.'" This section defines "fair and reasonable price" – the finding made by a contracting officer which results in applying mandatory priority – in relation to other proposals. The definition and the five percent cap mirror the language added to the Andrews AFB solicitation.

This new policy post-dates the award decision in this case. It is, therefore, not relevant. Because the purported policy was not in effect at the time the contracting officer made her award decision, the evidence does not establish a procurement violation and cannot serve as a basis for concluding the contracting officer's decision was arbitrary and capricious. *See* Joint Report at ¶ 10 ("The parties will promptly implement complementary regulations reflecting the joint policy herein.").

Accordingly, we consider Exhibit A, the affidavit of Deidre F. Brown of Brown & Pipkins, only insofar as it demonstrates prejudice and lost profits from the alleged errors. However, we hereby strike paragraph 5 of the affidavit, concerning the Andrews Air

Force Base procurement. We also strike the attached amendment to that solicitation, identified as Exhibit A-1. We consider Exhibit B, the Joint Report to Congress, dated August 29, 2006, irrelevant to these proceedings.

Consideration of the policy statement and the amended Air Force solicitation would not benefit Plaintiff. The formal application of a 5 percent/$1 million threshold merely confirms that before this new policy there was no similar cap, but that in the future such a cap should be applied by procuring agencies.

**D. <u>Blind Vendor Requirements</u>:**

In its amended complaint, Brown & Pipkins alleges that the Army failed to ensure that the SLA's cafeteria services would be performed by a blind vendor. Plaintiff's pleadings read:

> B&P has come to believe that the Army understands that the SLA's proposal contemplates that the work on the Project would be performed by Blackstone Industries, Inc. which B&P understands is not a blind vendor. B&P believes that the Department of Defense regulations require the Army to ensure that the cafeteria operations will be performed by a State licensed blind vendor which the Army apparently recognizes would not occur under the SLA's proposal. Therefore B&P believes the proposed award by the Army to the SLA would violate the Army's duty to ensure that the cafeteria operations will be performed by a State licensed blind vendor.

Amended Compl. at ¶ 32.

On their face, the Plaintiff's allegations do not establish an error in the procurement process or allege an arbitrary or capricious decision by the contracting officer. At best, Brown & Pipkins raises a possible contract administration issue. We have been pointed to no authority which imposes on the procurement officials a duty to reject an SLA's proposal based merely on the composition of blind and sighted individuals involved in performing the contract. *See Southfork Systems Inc. v. United States*, 141 F.3d 1124, 1138 (Fed. Cir. 1998) (contracting officer did not abuse discretion in considering bid of SLA where the blind vendor is cafeteria manager and all other employees are sighted). Moreover, we do not view it as the contracting officer's duty to investigate the legitimacy of a particular blind vendor's license with the SLA to determine compliance with the RSA. As the Government points out, enforcement and interpretation of the RSA is the province of the Secretary of Education. *See* 20 U.S.C. §§ 107a(a)(5), 107b; 34 C.F.R. §§ 395.5-8. The Department of Education's regulations impose a duty upon the SLA, not the procuring agency, to establish and maintain criteria for licensing qualified blind vendor applicants. 34 C.F.R. § 395.7.

DoD components do have their role in ensuring the proper administration of the RSA in their programs. Plaintiff's reliance on Army Regulation (Army Reg.) 210-25 in the context of this bid protest, however, is misplaced. That regulation does not govern procurement decisions. The section cited by the Plaintiff merely sets forth the general

responsibilities of Department of the Army officials – including the Secretary, the Assistant Chief of Staff for Installation Management and the various installation commanders – respecting compliance with the statute's priority scheme. For instance, although permit approval and disapproval functions are reserved for the higher echelons of Army leadership, the installation commander serves as the "on-site official" and local point of contact for SLAs. This individual, normally a general officer, has the responsibility to "[e]nsure that operators are in fact State licensed blind persons and that sighted employees and assistants are utilized only to the extent reasonably necessary." Army Reg. 210-25, ¶ 4 (c)(4).

Nowhere in the regulation does it suggest independent duties on the part of contracting officials to investigate the SLA's licensees and their business partnering arrangements. In fact, if it is determined that the licensee is not complying with the RSA – if, for example, blind vendors were not being used to the degree required – then there is a procedure established under the regulation for suspending or revoking the SLA's permit. This procedure involves written notice and a compliance period, and high level coordination with the Secretary of the Army.

Our bid protest jurisdiction under the Tucker Act does not extend into the realm of licenses and permitting. Nor would we exercise our jurisdiction over a dispute between the SLA and the Army involving alleged violations of the RSA. The statute provides a specific and comprehensive scheme for resolution of such disputes. *See generally, Colorado Dept. of Human Serv.*, __ Fed. Cl. __, 2006 WL 348854 (Nov. 30, 2006) (describing arbitration proceedings convened by Secretary of Education). Our jurisdiction is limited to alleged violations of procurement-related statutes or regulations. 28 U.S.C. § 1491 (b)(1); *see, RAMCOR Services Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (objection to statutory override of CICA stay alleges violation "in connection with" procurement). There is a serious question as to whether the Plaintiff alleges such a violation. All that is required of the contracting officer is that she apply the RSA preference procedures when informed that an approved SLA has submitted a proposal on behalf of one of its licensees. In this case, the contracting officer fulfilled these obligations when the Georgia SLA submitted a proposal on behalf of Mr. Frank Hulsey, one of its blind vendors. Although Plaintiff believes the SLA's proposal violates the spirit of the RSA, that challenge is an issue for another forum.

Even assuming some procurement related duty to ensure that the Georgia Department of Labor Business Enterprise Program properly licensed Mr. Hulsey or properly sponsored the Hulsey-BCI venture in this acquisition, Plaintiff has not demonstrated any reason to bring the licensing authority's actions into question. It cites only some organizational charts that were submitted by the SLA, and the comment referred to earlier in the cost/price aspects of the SLA bid. Plaintiff has not directed us to any material that would suggest these references are incompatible with a blind vendor license under the RSA. The remark about BCI's responsibility for accounting does not, on its face, suggest an improper relationship. Nor do we find that an organizational chart with a blind vendor at the top, supervising all the various elements below, should have caused the contracting officer to question the proposal as improper under the RSA, especially where the SLA has approved the vendor. *Southfork*, 141 F.3d at 1138.

**E. <u>Sufficiency of Pricing Information</u>:**

Finally, we address one other subject which was not pressed to the same extent as the Plaintiff's other allegations. Nevertheless, it appeared in Brown and Pipkins' amended pleadings. Upon examining the administrative record, Brown & Pipkins avers:

> [The] SLA's proposed pricing was unclear and its proposal was defective because the SLA: (1) did not total proposed hours; (2) apparently did not include contractor furnished material costs of $1,200,000 in the total proposal amount; and (3) did not show the computation of fee in its summary breakdown per year or by building. As a result, the Army could not tell what the SLA's proposed price really was (other than to know it was at least $5.67 million higher than B&P's.) B&P believes that such errors in a proposal render the proposal non-responsive.

Amended Complaint at ¶ 33.

The administrative record did, in fact, reveal that the SLA's pricing data required clarification. The Army sought clarifications prior to completing cost realism and cost completeness. The contracting officer accounted for these clarifications by noting the difference between the SLA's "proposed cost" and the "most probable cost estimate." Source Selection Decision Statement, Price Chart at AR 919.

We find no error in these actions. Plaintiff suggests that the omissions should have resulted in the outright rejection of the SLA's proposal. The principle of responsiveness, however, is not involved in this procurement. In the sealed bid context, minor deficiencies might prove fatal, but in a negotiated procurement, the agency may permit the offeror to correct minor discrepancies. *See ManTech Telecommunications and Information Sys. Corp. v. United States*, 49 Fed. Cl. 57, 70-71 (Fed. Cl. 2001) (citations omitted). Moreover, we note that the record indicates that certain aspects of Brown & Pipkins' bid also required clarification. Except for operation of the RSA preference, the Army "place[d] all offerors in the "same competitive position." *Id.* at 71.

## CONCLUSION

For the reasons stated, we reject each of Plaintiff's grounds for protest. We conclude that the Army's procurement decision complied with the RSA, then-current DoD policy, applicable procurement regulations, and the RFP itself. Moreover, we find that the Plaintiff has not sustained its burden of demonstrating that the contracting officer abused her discretion or that her decisions were arbitrary and capricious.

Accordingly, we find in favor of the Defendant. **Plaintiff's motion for judgment on the administrative record and its motion for a permanent injunction are DENIED. The Government's motion for judgment on the administrative record is hereby GRANTED, as is its related motion to strike Plaintiff's exhibits (filed January 10, 2007). The Clerk is directed to enter judgment on behalf of Defendant.**

IT IS SO ORDERED.

/s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge